# United States Court of Appeals for the Federal Circuit

MEDIA CONTENT PROTECTION LLC,

*Plaintiff-Appellant,*

– v. –

INTEL CORPORATION,

*Defendant-Appellee.*

*On Appeal from the United States District Court for the District of Delaware in No. 1:20-cv-01243-CFC-LDH Honorable Colm F. Connolly, Chief Judge*

## BRIEF FOR PLAINTIFF-APPELLANT

MICHAEL RENAUD
WILLIAM MEUNIER
TIMOTHY J. ROUSSEAU
MINTZ, LEVIN, COHN, FERRIS,
   GLOVSKY AND POPEO, PC
One Financial Center
Boston, Massachusetts 02111
(617) 348-1845
mtrenaud@mintz.com
wameunier@mintz.com
tjrousseau@mintz.com

PETER F. SNELL
MINTZ, LEVIN, COHN, FERRIS,
   GLOVSKY AND POPEO, PC
919 Third Avenue, 38th Floor
New York, New York 10022
(212) 935-3000
pfsnell@mintz.com

JEFFREY A. LAMKEN
MICHAEL G. PATTILLO JR.
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com
mpattillo@mololamken.com

*Counsel for Plaintiff-Appellant*

FEBRUARY 9, 2026

 (800) 4-APPEAL • (389603)

# U.S. PATENT NO. 9,436,809
### (element labels added)

1.  A first device for controlling delivery of protected content to a second device, the first device comprising:

[a] a memory;

[b] a processor, said processor arranged to:

> [c] receive a certificate of the second device, the certificate providing information regarding the second device;

> [d] determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate;

> [e] provide a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules;

> [f] receive a second signal from the second device after providing the first signal;

> [g] determine whether the second signal is derived from a secret known by the first device;

> [h] determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and

> [i] allow the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.

CERTIFICATE OF INTEREST

**Case Numbers:**        2026-1237

**Short Case Caption:** *Media Content Protection LLC v. Intel Corporation*

**Filing Party/Entity:** Plaintiff-Appellant Media Content Protection LLC

I certify the following information is accurate and complete to the best of my knowledge.

Date: February 9, 2026          /s/ Peter F. Snell

Peter F. Snell

**Represented Entities** (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

Appellant Media Content Protection LLC

**Real Party in Interest** (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None/Not Applicable

**Parent Corporations and Stockholders** (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None/Not Applicable

**Legal Representatives** – List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R 47.4(a)(4).

**Farnan LLP**
Brian E. Farnan (Farnan LLP)
Michael J. Farnan (Farnan LLP)

**Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C.**
Adam R. Banes
Adam S. Rizk

Brad M. Scheller
Catherine Cheng Xu
Courtney P. Herndon
Gabriella J. Flick
Hannah M. Edge
Marguerite I. McConihe
Michael J. McNamara
Nana Liu
Sean M. Casey
Tawfik A. Goma
Tianyi Tan
Williams S. Dixon
Meena Seralathan (formerly)
Andrew H. DeVoogd (formerly)

**Related Cases** – Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

No other appeal in or from the same civil action was previously before this or any other appellate court.

The following appeal involved U.S. Patent No. 9,436,809, which is at-issue in this appeal:

- *Intel Corp. v. Koninklijke Philips N.V.*,
  Nos. 2022-2034, 2022-2035,
  2024 WL 725243 (Fed. Cir. Feb. 22, 2024)
  (Judges Prost, Taranto, and Chen)
  Originating Tribunal: IPR2021-00327, IPR2021-00370 (PTAB).

The following appeals are currently pending before this Court and involve U.S. Patent No. 10,298,564, which shares a common specification and priority claim with the patents at-issue in this appeal:

- *Media Content Protection LLC v. Realtek Semiconductor Corporation,*
  *MediaTek, Inc., MediaTek USA, Inc.*,
  Nos. 2025-2041, 2025-2045 (consolidated) (Fed. Cir.)
  Originating Tribunal: Nos. 1:20-cv-01246, 1:20-cv-01247 (D. Del.).

The following district court cases are currently stayed pending the resolution of the cases underlying this appeal and the appeal in Case Nos. 2025-2041, 2025-2045 (consolidated) and may be directly affected by this Court's decision in this appeal:

- *Media Content Protection LLC v. Dell Technologies Inc. and Dell Inc.*,
  No. 1:20-cv-01240 (D. Del.);

- *Media Content Protection LLC v. HP Inc.*,
  No. 1:20-cv-01241 (D. Del.);

- *Media Content Protection LLC v. Lenovo (United States) Inc.*,
  No. 1:20-cv-01242 (D. Del.);

- *Media Content Protection LLC v. Hisense Co. Ltd, Hisense Visual Technology Co. Ltd. (f/k/a Qingdao Hisense Electronics Co. Ltd.), Hisense Electronics Manufacturing Company of America Corporation, Hisense USA Corporation, Hisense Import & Export Co. Ltd., Hisense International Co., Ltd., Hisense International (HK) Co., Ltd., and Hisense International (Hong Kong) America Investments.*,
  No. 2:20-cv-08546 (C.D. Cal.).

**Organizational Victims and Bankruptcy Cases** – Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None/Not Applicable

# TABLE OF CONTENTS

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 4

STATEMENT OF ISSUES ..................................................................... 4

STATEMENT OF THE CASE ................................................................. 5

I.  The '809 and '186 Patents Advance the Technology for
    Secure Transfer of Digital Content ........................................... 5

    A.  The Shortcomings of the Prior Art *Brands-Chaum*
        Distance-Bounding Computer ............................................. 6

    B.  The '809 and '186 Patents Provide a Technological
        Solution for Secure Transfer of Digital Content Using
        Authenticated Distance Measurement .................................. 8

II. Proceedings Concerning the Asserted and Related Patents ..... 15

    A.  This Court and the PTAB Uphold the '809 Patent and
        Related Patents Against Obviousness Challenges .............. 16

    B.  The ITC Finds the Asserted Claims Patent-Eligible Under
        § 101 ................................................................................... 17

    C.  The District Court Holds That the Asserted Claims Are
        Not Patent-Eligible Under § 101 ....................................... 19

SUMMARY OF ARGUMENT ............................................................. 22

STANDARD OF REVIEW ................................................................... 26

ARGUMENT ..................................................................................... 26

I.  The '809 and '186 Patents Are "Directed to" Concrete
    Improvements to Technology for Secure Transfer of
    Protected Digital Content—Not an Abstract Idea .................. 28

    A.  The '809 and '186 Patents Claim a Specific Technological
        Solution for Securely Transferring Protected Digital
        Content Using Authenticated Distance Measurement ........ 28

        1.  The Asserted Claims Are Directed to a Patent-Eligible
            Improvement to the *Brands-Chaum* Distance-
            Bounding Computer ................................................. 28

    2.    The Asserted Claims Represent the Type of Technological Improvement This Court Has Found Patent-Eligible at Step One ............................................................34

  B.    The District Court Committed Multiple Errors in Finding the Claims Directed to an Abstract Idea at Step One.........................38

    1.    The District Court's Analysis of the Claim Limitations Defies Both Precedent and the Patents' Disclosures .....................38

    2.    The District Court Misapplied This Court's § 101 Precedent ...........................................................................................44

II.    The Asserted Claims Contain an "Inventive Concept" That Represents a Patentable Advance Over the Prior Art Under *Alice* Step Two...........................................................................................46

  A.    The Asserted Claims Recite a Specific, Inventive Solution to Authenticated Content Transfer, Whether the Elements Are Considered Individually or in Combination.................................47

    1.    The Transmitter's Use of a Certificate to Authenticate the Receiver as Compliant With a Set of Compliance Rules (Claim Elements 1[c]–[e]) Was Inventive ...........................48

    2.    The Transmitter's Use of a Second Signal Based on a Shared Secret to Enable Authenticated Distance Assessment (Claim Elements 1[e]–[i]) Was Inventive.................50

    3.    The Ordered Combination of Claim Elements Was Inventive............................................................................................55

  B.    The District Court's Unsupported Step Two Analysis Cannot Be Sustained ...........................................................................59

CONCLUSION ................................................................................................62

## Cases

*Alice Corp. v. CLS Bank Int'l*,
    573 U.S. 208 (2014)..............................................................*passim*

*Ancora Techs., Inc. v. HTC Am., Inc.*,
    908 F.3d 1343 (Fed. Cir. 2018) ..........................................*passim*

*BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016) ........................................55, 62

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018) ..........................................*passim*

*CardioNet, LLC v. InfoBionic, Inc.*,
    955 F.3d 1358 (Fed. Circ. 2020)......................................26, 28, 29

*Centrak, Inc. v. Sonitor Techs., Inc.*,
    915 F.3d 1360 (Fed. Cir. 2019) ........................................26, 59

*Certain Digital Video-Capable Devices and Components Thereof*,
    No. 337-TA-1224,
    2021 WL 2375006 (ITC May 24, 2021)..............................18, 23, 39

*Certain Digital Video-Capable Devices and Components Thereof*,
    No. 337-TA-1224,
    2021 WL 6071754 (ITC Oct. 21, 2021) ..........................*passim*

*Certain Digital Video-Capable Devices and Components Thereof*,
    No. 337-TA-1224,
    2022 WL 1302722 (ITC Apr. 26, 2022)............................19

*Contour IP Holding LLC v. GoPro, Inc.*,
    113 F.4th 1373 (Fed. Cir. 2024) ......................................26

*CosmoKey Solutions GmbH v. Duo Security LLC*,
    15 F.4th 1091 (Fed. Cir. 2021) ......................................*passim*

*Diamond v. Diehr*,
    450 U.S. 175 (1981)........................................................43

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) ......................................28, 46

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018) ..................................28, 47, 48

*Gonzalez v. Sec'y of Dep't of Homeland Sec.*,
  978 F.3d 254 (3d Cir. 2012) ........................................................26, 59

*Intel Corp. v. Koninklijke Philips N.V.*,
  IPR2021-00327,
  2022 WL 1617415 (PTAB May 12, 2022).............................7, 16, 54

*Intel Corp. v. Koninklijke Philips N.V.*,
  IPR2021-00370,
  2022 WL 1618012 (PTAB May 12, 2022).............................8, 16, 54

*Intel Corp. v. Koninklijke Philips N.V.*,
  Nos. 2022-2034, 2022-2035,
  2024 WL 725243 (Fed. Cir. Feb. 22, 2024) ...............................*passim*

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
  942 F.3d 1143 (Fed. Cir. 2019) .......................................................39

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016) .......................................................38

*PowerBlock Holdings, Inc. v. iFit, Inc.*,
  146 F.4th 1366 (Fed. Cir. 2025) ................................................24, 42

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
  696 F. App'x 1014 (Fed. Cir. 2017) ................................................45

*RecogniCorp, LLC v. Nintendo Co.*,
  855 F.3d 1322 (Fed. Cir. 2017) .......................................................60

*TCL Indus. Holdings Co. v. Koninklijke Philips N.V.*,
  IPR2021-00497, Paper 10 (PTAB Aug. 17, 2021)...........................55

*TecSec, Inc. v. Adobe, Inc.*,
  978 F.3d 1278 (Fed. Cir. 2010) ................................................*passim*

*Universal Secure Registry LLC v. Apple Inc.*,
  10 F.4th 1342 (Fed. Cir. 2021) .......................................................44

*Weisner v. Google LLC*,
  51 F.4th 1073 (Fed. Cir. 2022) .......................................................29

**Statutes and Rules**

28 U.S.C. §1295 ....................................................................................4

28 U.S.C. §1331 ....................................................................................4

28 U.S.C. §1338 ....................................................................................4

35 U.S.C. §101 ........................................................................2

Fed. R. Civ. P. 56 .......................................................26, 40, 59

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| '186 Patent | U.S. Patent No. 10,091,186 (Appx34–44) |
| '564 Patent | U.S. Patent No. 10,298,564 (Appx1610–19) |
| '809 Patent | U.S. Patent No. 9,436,809 (Appx23–33) |
| '977 Patent | U.S. Patent No. 9,590,977 (Appx1598–607) |
| Dell | Dell Technologies Inc. and Dell Inc. |
| *Dell* Case | *Media Content Protection LLC v. Dell Techs. Inc. et al.*, No. 1:20-cv-01240-CFC-LDH (D. Del.) |
| district court | United States District Court for the District of Delaware in Case Nos. 1:20-cv-01246-CFC-LDH, 1:20-cv-01247-CFC-LDH, Chief Judge Colm F. Connolly |
| DTCP | Digital Transmission Content Protection |
| HDCP | High-bandwidth Digital Content Protection |
| HiSense | Hisense Co. Ltd, Hisense Visual Technology Co. Ltd. (f/k/a Qingdao Hisense Electronics Co. Ltd.), Hisense Electronics Manufacturing Company of America Corporation, Hisense USA Corporation, Hisense Import & Export Co. Ltd., Hisense International Co., Ltd., Hisense International (HK) Co., Ltd., and Hisense International (Hong Kong) America Investments |
| *HiSense* Case | *Media Content Protection LLC v. Hisense Co. et al.*, No. 2:20-cv-08546 (C.D. Cal.) |
| HP | HP Inc. |
| *HP* Case | *Media Content Protection LLC v. HP Inc.*, No. 1:20-cv-01241-CFC-LDH (D. Del.) |
| Intel | Intel Corporation |
| *Intel* Case | *Media Content Protection LLC v. Intel Corp.*, No. 1:20-cv-01243-CFC-LDH (D. Del.) |

| | |
|---|---|
| IPR | *inter partes* review |
| ITC | U.S. International Trade Commission |
| ITC Investigation | *Certain Digital Video-Capable Devices and Components Thereof*, No. 337-TA-1224 (ITC) |
| Lenovo | Lenovo (United States) Inc. |
| *Lenovo* Case | *Media Content Protection LLC v. Lenovo (United States) Inc.*, No. 1:20-cv-01242-CFC-LDH (D. Del.) |
| LG | LG Electronics Inc. and LG Electronics U.S.A. Inc. |
| *LG* Case | *Koninklijke Philips N.V. v. LG Elecs. Inc. et al.*, No. 1:20-cv-01244-CFC (D. Del.) |
| MCP | Plaintiff-Appellant Media Content Protection LLC |
| MediaTek | Defendant-Appellee MediaTek, Inc. and MediaTek USA, Inc. |
| *MediaTek* Case | *Media Content Protection LLC v. MediaTek, Inc. and MediaTek USA, Inc.*, No. 1:20-cv-01246-CFC-LDH (D. Del.) |
| Philips | Koninklijke Philips N.V. ("Philips NV") and Philips North America LLC ("Philips NA") |
| PTAB | Patent Trial and Appeal Board |
| TCL | TTE Technology, Inc., TCL Corp., TCL Electronics Holdings Ltd., TCL King Electrical Appliances (Huizhou) Co. Ltd., TCL Moka Int'l Ltd., TCL Overseas Marketing Ltd., and TCL Industries Holdings Co., Ltd. |
| *TCL* Case | *Koninklijke Philips N.V. v. TTE Tech., Inc. et al.*, No. 2:20-cv-01406 (C.D. Cal.) |
| Realtek | Defendant-Appellee Realtek Semiconductor Corporation |

| *Realtek* Case | *Media Content Protection LLC v. Realtek Semiconductor Corp.*, No. 1:20-cv-01247-CFC-LDH (D. Del.) |
| --- | --- |
| RTT | round-trip time |
| USPTO | U.S. Patent and Trademark Office |

**\* Note:** All emphasis in the brief has been added unless otherwise indicated.

No other appeal in or from the same civil action was previously before this or any other appellate court.

The following appeals involved the '809 Patent, which is at issue in this appeal:

- *Intel Corp. v. Koninklijke Philips N.V.*,
  Nos. 2022-2034, 2022-2035,
  2024 WL 725243 (Fed. Cir. Feb. 22, 2024)
  (Judges Prost, Taranto, and Chen).

The following appeals are currently pending before this Court, have been designated as companion cases to this appeal (D.I. 18), and involve the '564 Patent, which shares a common specification and priority claim with the '809 and '186 Patents at issue in this appeal:

- *Media Content Protection LLC v. Realtek Semiconductor Corporation,*
  *MediaTek, Inc., MediaTek USA, Inc.*,
  Nos. 2025-2041, 2025-2045 (consolidated) (Fed. Cir.).

The following district court cases are currently stayed pending the resolution of the cases underlying this appeal and the appeals in Case Nos. 2025-2041, 2025-2045 (consolidated) and may be directly affected by this Court's decision in this appeal:

- *Media Content Protection LLC v. Dell Techs. Inc. et al.*,
  No. 1:20-cv-01240 (D. Del.);

- *Media Content Protection LLC v. HP Inc.*,
  No. 1:20-cv-01241 (D. Del.);

- *Media Content Protection LLC v. Lenovo (United States) Inc.*, No. 1:20-cv-01242 (D. Del.);

- *Media Content Protection LLC v. Hisense Co. Ltd. et al.*, No. 2:20-cv-08546 (C.D. Cal.).

This case concerns a groundbreaking invention for securely transferring protected digital content between devices to prevent unauthorized copying and distribution. The patents at issue—U.S. Patent Nos. 9,436,809 (the "'809 Patent") and 10,091,186 (the "'186 Patent")—involve the combination of authentication protocols with a "distance-bounding" protocol. The claimed distance-bounding technology allows a device to access digital content only if the device is authorized and in physical proximity to the content source. It ensures that the distance measurement is conducted with the authenticated device, preventing the interposition of some other unauthenticated device.

Distance-bounding technology was known at the time of the patents, as exemplified by the "*Brands-Chaum*" computer. But existing technology was not suitable for content protection. While *Brands-Chaum* could tell that ***a*** device was nearby, it was not capable of determining whether the device was ***authenticated*** to receive protected content. The invention here solved that problem. The patents disclose and claim a transmitter that uses a certificate provided by a receiver to determine whether the receiver is compliant with a set of compliance rules, and sends a first signal to the receiver to initiate a round-trip time distance measurement. The transmitter provides protected content to the receiver once the transmitter determines that the signal received from the receiver is derived from a "shared secret" known to

both the transmitter and the receiver, and that the time between the sending and receiving of those same signals is less than a predetermined time. In that way, the invention ensures that the receiver is both authenticated and located near the transmitter. This Court and the USPTO have determined that the solution was nonobvious. To the contrary, employing a multi-bit signal to measure proximity, as the invention necessarily requires, contradicted the teachings of the prior art.

The district court nonetheless held the asserted claims invalid under 35 U.S.C. § 101. Granting summary judgment, the court ruled that the patents are merely directed to the abstract idea of "authenticated content transfer." But the court committed legal error at both steps of the § 101 analysis required by *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

At *Alice* step one, the court found that the patents were not directed to a specific technical solution of performing authenticated digital content transfer. But the court ignored all the claim limitations specifying exactly ***how*** the invention performs authenticated content transfer. And the court failed to faithfully apply this Court's precedents, candidly "confess[ing]" that it was "unable to understand" how this Court had found similar claims to be sufficiently "'specific' or 'technological'" and therefore patent-eligible in *CosmoKey Solutions GmbH v. Duo Security LLC*, 15 F.4th 1091 (Fed. Cir. 2021). Appx15. That conceded inability "to understand" what constitutes a technological improvement was fatal to the district court's decision.

The district court compounded its error at *Alice* step two by summarily deciding that the patent lacks an inventive concept based on its unsupported factual determination that "the patent does not disclose[] a 'specific type' of either authentication or authenticated proximity determination." Appx17. But the patents expressly teach a specific technological improvement over the then-state-of-the-art *Brands-Chaum* computer, which "does not allow authenticated device compliancy testing." Appx28(2:26–34). Indeed, that art warned against the patents' chosen solution. For that reason, this Court and the PTAB have held that the invention claimed here and in related patents is a nonobvious advance over *Brands-Chaum* and other art. If the invention would not have been ***obvious*** to a skilled artisan, then it cannot have been a ***conventional*** combination of ***conventional*** authentication techniques. At a bare minimum, there was a fact question regarding the invention's conventionality that the district court was not free to resolve at summary judgment.

The asserted claims are not directed to an unpatentable law of nature, natural phenomenon, or abstract idea, but to the type of technological improvement to computer security that employs a specific, unconventional technique to solve a specific problem in the prior art that this Court has repeatedly upheld as patent-eligible. Reversal is warranted.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). It issued final judgment on December 4, 2025. Appx21–22. MCP timely filed a notice of appeal on December 5, 2025. Appx4750–52. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1. Whether the district court erred in holding that the asserted claims are directed to the abstract idea of "authenticated content transfer" under *Alice* step one when (a) the claims recite a technological improvement over the *Brands-Chaum* computer described in the patents' specification and prosecution histories; and (b) the district court "confess[ed]" this Court's *CosmoKey* decision supports a finding of patent eligibility.

2. Whether the district court erred in concluding that the asserted claims lack an inventive concept under *Alice* step two when it (a) failed to draw all reasonable inferences in patent owner's favor that the claims are directed to unconventional combinations of unconventional elements in considering defendant's motion for summary judgment and (b) made unsupported factual findings as to alleged conventionality that were contrary to the patents' specification, prior decisions from this Court and the PTAB holding the claimed invention

nonobvious, and other evidence of record that raised at least a genuine dispute regarding material facts.

**STATEMENT OF THE CASE**

This case involves a technological solution to the technological problem of controlling access to protected content. The '809 and '186 Patents and related patents have survived repeated challenges before the PTAB, on appeal to this Court, and before the ITC. But the district court held the asserted claims invalid under § 101 for lack of patentable subject matter. A1–19 (Memorandum Opinion; 2025 WL 3281776); A20 (Order); A21–22 (Final Judgment).

## I. THE '809 AND '186 PATENTS ADVANCE THE TECHNOLOGY FOR SECURE TRANSFER OF DIGITAL CONTENT

The '809 and '186 Patents at issue here are members of a family of patents— also including U.S. Patent No. 10,298,564 (the "'564 Patent")—invented by Philips engineer Franciscus Kamperman and originally issued to Philips NV. *See* Appx23; Appx34. The patents share a common specification and priority claim to European Patent Application No. EP02078076, filed July 26, 2002. Appx23; Appx34; Appx1610–19.

The advent of digital content has given rise to problems of copy protection. As the patents explain, digital content is much easier to copy and pirate than analog

5

content. Appx28 (1:37–57).[1] And digital content is particularly susceptible to piracy when digital data is transferred between devices, such as when it is downloaded over the Internet. Appx28 (1:65–2:22). A "slew of copy protection and [digital rights management] systems and methods" have been developed to combat that problem, often using "technologies such as encryption, watermarking and right descriptions (*e.g.*, rules for accessing and copying data)." Appx28 (1:59–64).

The '809 and '186 Patents disclose a new technology for securely transferring digital content between two devices that "combines a distance measurement protocol with an authentication protocol." Appx28 (2:50–51). The claims at issue focus on the transmitter device or computer; the claims of the '564 Patent, not asserted in this case, focus on the receiver.

## A. The Shortcomings of the Prior Art *Brands-Chaum* Distance-Bounding Computer

The '809 and '186 Patents disclose that one way to prevent unauthorized use or sharing of digital content is to require ***physical proximity*** to an authorized licensee by, for example, limiting distribution to a local network instead of the global Internet. Appx28 (1:37–57, 2:8–22); *see also* Appx2937 (19:12–22); Appx4588 (99:20–100:18) (inventor: "depend[ing] on the application … you may want to prevent that content from travel[ing] from U.S. to Europe"). Before the

---

[1] Unless otherwise noted citations are to the specification and figures of the '809 Patent and apply equally with respect to the '186 Patent.

patents, distance-bounding computers were exemplified by the *Brands-Chaum* computer, Appx2816–31; Appx4126–29, discussed in the specification and considered during prosecution. Appx23, Appx28 (2:26–34); Appx35.

To achieve distance confirmation, *Brands-Chaum* used rapid, single-bit exchanges to determine an upper bound on the distance between two devices. Using the speed of light, *Brands-Chaum* calculates that distance based on the time it takes for a signal to travel between the devices. Appx4128–29; Appx28 (2:26–34). Because light travels extremely fast, this Court has explained, the use "of a ***single-bit*** challenge and rapid ***single-bit*** response" was "an '***essential*** element' of [*Brands-Chaum*'s] distance-bounding protocol." *Intel Corp. v. Koninklijke Philips N.V.*, Nos. 2022-2034, 2022-2035, 2024 WL 725243, at *1 (Fed. Cir. Feb. 22, 2024) (emphasis in original). Using multi-bit messages "would create unwanted delays, which in turn would render the distance measurement inaccurate and impair security." *Id.*

The '809 and '186 Patents explain that *Brands-Chaum*'s use of ***single-bit*** messages meant that it "does not allow ***authenticated*** device compliancy testing," which requires multi-bit exchanges. Appx28 (2:29–34). As the PTAB found, and this Court affirmed, the multiple-bit exchanges required for authentication and compliance testing were fundamentally "incompatible" with *Brands-Chaum*. *Intel Corp. v. Koninklijke Philips N.V.*, IPR2021-00327, 2022 WL 1617415, at *10

(PTAB May 12, 2022) (Appx4298); *Intel Corp. v. Koninklijke Philips N.V.*, IPR2021-00370, 2022 WL 1618012, at *10 (PTAB May 12, 2022); *Intel*, 2024 WL 725243, at *1. As a result, *Brands-Chaum* could only establish that two **anonymous** devices were near each other. *Id.*

Thus, before the patented invention, prior art computers could use round-trip time methods only for determining proximity with ***unauthenticated*** receivers of ***unknown compliance***. Appx28 (2:26–34); Appx4128–29. The patents here describe the dangers of the transmitter performing the distance assessment in relation to an unauthenticated, non-compliant device near the transmitter. Appx29 (3:4–11). Communicating with an unauthenticated device reduces system security because it is unknown how the unauthenticated device will treat the content, including whether the device will copy or redistribute the content. Performing distance assessment with a nearby but unauthenticated device does not prevent the device from retransmitting the content to a faraway device in violation of the distance-limiting requirement. Appx29 (3:4–11).

### B. The '809 and '186 Patents Provide a Technological Solution for Secure Transfer of Digital Content Using Authenticated Distance Measurement

As the patents explain, their claimed invention solves the critical shortcoming of the prior art *Brands-Chaum* distance-bounding computer—it uses multi-bit transmissions that enable "performing authenticated distance measurement between

8

the first communication device and a second communication device." Appx28 (2:38–41). In other words, the invention enables the transmitter to determine not only that *a device* is nearby, but that *an authenticated, compliant receiver* is nearby before allowing the receiver to receive the protected content.[2]

The patents explain that, "to enable secure communication between devices," the receiver "can first be tested on compliancy before a distance measurement is executed." Appx28 (2:51–55). This element involves "checking if the identification of the [receiver] is compliant with an expected identification"—that is, making sure that the receiver "really is the device that it should be." Appx29 (3:56–61). The patents further explain that the "identity [of the receiver] could be obtained by checking a certificate stored in the [receiver]." Appx29 (3:30–61).

Representative claim 1 of the '809 Patent reflects that requirement, reciting that the transmitter (the "first device") includes a processor arranged to "receive a certificate of the first device [the receiver], the certificate providing information regarding the second device" and "determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate."

---

[2] *See also* Appx2579 (94:8–12) (inventor confirming he had "the idea of combining [a secure authenticated channel] between two entities and [a] technique to measure geographical distance between two entities"); Appx2592 (88:7–15) (inventor confirming that "the idea [he] came up with … combine[d] two things. … The first one being a distance measurement protocol and the other one being an authentication protocol").

*E.g.*, Appx29–31 (Fig. 2, 3:56–61, 5:60–6:20, elements 1[c]–[d]). Under the stipulated claim construction in this case, the certificate must include "at least the entity's distinguishing identifier and public key, and [be] signed by a certification authority to guard against forgery." Appx2928; *see also* Appx28–29 (1:65–2:2, 3:40–44, 3:56–61).

The invention further requires that the transmitter and receiver "share" a cryptographic "common secret" that is ***also*** to be "used in performing the distance measurement" between the two devices. Appx28 (2:38–44). The transmitter can share the secret with the receiver after determining that the receiver "is complaint" with the "predetermined compliance rules." Appx29 (3:40–47). The specification explains that "secure way[s] of … ensur[ing] that only devices being compliant with compliance rules can receive the secret" were known in the art, including certain "key transport mechanisms" and "key agreement protocol[s]." Appx29 (3:48–55).

The claim thus recites that, after the receiver has been found compliant with the set of compliance rules, the distance-bounding determination is performed using the shared secret. In particular, the transmitter "provide[s] a first signal" to the receiver "depending when the second device is determined to be compliant with the set of compliance rules" (element 1[e]) and then "receive[s] a second signal" from the receiver in return (element 1[f]). The transmitter then "determine[s] whether the

second signal" it received from the receiver "is derived from [the devices' shared] secret" (element 1[g]).

Once the transmitter determines the second signal is derived from the shared secret, the transmitter "determine[s] whether a time difference between providing the first signal and receiving the second signal [sometimes referred to as "round-trip time" or "RTT"] is less than a predetermined time" (element 1[h]). Under the stipulated claim construction in this case, "predetermined time" means "a time interval selected to ensure that the first and second communication devices are sufficiently near one another to permit access to the protected content, where sufficiently near refers to physical proximity." Appx2928; *see also* Appx2937(19:12–20:6). The transmitter then "allow[s] the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time" (element 1[i]).

The use of the recited "predetermined time" to perform distance measurement is crucial to making the secure authentication possible. As explained above, *Brands-Chaum* determined physical proximity by relying on the speed of light to determine distance, which necessitated the use of single-bit messages because multi-bit messages would create unwanted delays and render distance measurement inaccurate. Appx4128–29. The patents' use of a "predetermined time" instead

ensures physical proximity by ensuring that content remains within a local network and is not transmitted over the Internet. Appx28(2:10–22). As plaintiff's counsel explained immediately before the stipulated construction was entered:

> [T]he intrinsic record … teaches that when you have a round trip time that's being used between two devices on an ethernet network, that's indicative of physical proximity, and it's a distinguisher from those devices if they attempt to reach out to the internet, for example. … The predetermined time check will fail, and the device will not be permitted to send content out over the internet.

Appx2937(19:12–17); *see also* Appx4588(99:20–100:18). Because the invention's novel approach to determining physical proximity does not rely on directly comparing the messages' timing to the speed of light to determine physical distance, it made it possible to use multi-bit messages, such as the first and second signals, to confirm ***both*** that the receiver is in physical proximity and is authenticated.

The second signal, created based on the shared secret, thus provides the transmitter with information it can use to determine that the second signal came from the receiver that was subject to the certificate-based compliancy testing, rather than an unauthenticated device that may copy or redistribute the content without authorization. Appx28–30(2:58–65, 5:36–43, 6:30–36). In this manner, the same first and second signals used to determine proximity can also be used (in combination with the shared secret) to ensure that the distance assessment is being performed with the correct (authenticated) device before protected content is shared

(element 1[i]). Appx29 (3:4–14). The patents explain that the use of the shared secret ensures "that the distance will not be measured to a third communication device (not knowing the secret)." Appx29 (3:5–14). And "[b]y using authenticated distance measurement in connection with sharing data between devices, unauthorized distribution of content can be reduced." Appx29 (4:3–5).

Before the invention at issue here, participants in the digital content protection industry—including Intel, Warner Brothers, Sony, and Toshiba—did not claim to have discovered using round-trip time or "RTT" (much less RTT using signals based on a shared secret) to decide whether a "receiving device is 'close enough' to the transmitting device" to receive protected content; they first identified using RTT for this purpose **well after** the patents' priority date. Appx4526–27 (¶¶ 70–71), Appx4531–34 (¶¶ 91–93). MCP's validity expert and former Senior Vice President & Chief Technology Officer of the Motion Picture Association of America (MPAA), Jim Williams, thus explained that the claimed invention preceded the content industry's use of RTT distance measurement. Appx4535–37 (¶¶ 96–98). And Intel admitted it did not "work out" the "localization problem" until 2004. Appx4190; *see also* Appx4199–200 (2004 submission to FCC); Appx4202 (same); Appx4210 (FCC Order); Appx4159–61 (Warner Brothers patent); Appx4150 (same); Appx4163–64 (Sony patent); Appx4156–57 (same); Appx4152–54 (Toshiba patent); Appx4156–57 (same).

Prior publications on cryptography, moreover, underscore the difficulty of modifying or combining prior protocols. Appx4528–30 (¶¶75–78), Appx4538–39 (¶560) (Mr. Williams explaining difficulties in designing and modifying content protection systems); Appx4140 ("The apparent simplicity of the techniques presented … is misleading. The design of such techniques is intricate and the security is brittle; those presented have been carefully selected."); Appx4132 ("It is very difficult to maintain a protocol's security if most of the parties involved are active cheaters."); Appx4134 ("You can't make systems secure by tacking on cryptography as an afterthought. You have to know what you are doing every step of the way ….").

Prior art cryptography protocols for content protection, including Intel's Digital Transmission Content Protection version 1.2 ("DTCP 1.2"), were designed by "[t]eams of expert engineers at major companies" including Intel shortly before the patents' priority date. Appx4524–27 (¶¶66–70), Appx4540 (¶648). Those state-of-the-art cryptography protocols did not include the patented invention. The record thus shows that, even just before the priority date, the industry was not combining authentication and a proximity determination (much less doing so by using RTT based on signals using a shared secret). As Mr. Williams explained, that history defies the notion that skilled artisans were motivated to or would divine the patents'

teachings "even before the proverbial ink had time to dry on [DTCP 1.2's] pages." Appx4527 (¶71).

In other words, the content protection industry was "spinning its wheels" just before the patents' invention because "develop[ing] a secure system for digital television" was "a much more difficult proposition than Internet security." Appx4196 (cited by Intel's IPR expert: Appx4289 n.32).

## II. PROCEEDINGS CONCERNING THE ASSERTED AND RELATED PATENTS

Philips sued Intel and its customers in district court for infringing the '809 and '186 Patents based on processors and computers that implement High-bandwidth Digital Content Protection version 2 ("HDCP 2"). Appx85 (¶18); *see also* Appx3084–85 (¶17).[3] Philips separately sued MediaTek, Realtek, and others for infringing the '564 Patent based on their HDCP 2 receiver products;[4] the *MediaTek* and *Realtek* Cases are the subject of related appeal Nos. 2025-2041, 2025-2045 (consolidated). Philips assigned the patents to MCP, which has been substituted as plaintiff. Appx1543–49.

---

[3] *Dell* Case, D.I. 1 (Sept. 17, 2020); *HP* Case, D.I. 1 (Sept. 17, 2020); *Lenovo* Case, D.I. 1 (Sept. 17, 2020); *LG* Case, D.I. 1 (Sept. 17, 2020); *TCL* Case, D.I. 1 (Sept. 12, 2020); *Hisense* Case, D.I. 1 (Sept. 17, 2020).

[4] *Supra* n.3; *MediaTek* Case, D.I. 1 (Sept. 17, 2020); *Realtek* Case, D.I. 1 (Sept. 17, 2020).

## A. This Court and the PTAB Uphold the '809 Patent and Related Patents Against Obviousness Challenges

Various accused infringers filed IPR petitions against the asserted patents. Intel filed two against the '809 Patent (IPR2021-00327, IPR2021-00370) and one against the '186 Patent (IPR2021-00328). TCL filed one petition against the '564 Patent (IPR2021-00497), and three against the related '977 Patent (IPR2021-00495, IPR2021-00496, IPR2021-00547). The PTAB denied the petitions challenging the '564 and '977 Patents on the merits. "Petitioner has not demonstrated," the PTAB ruled, "a reasonable likelihood that it would prevail in showing the unpatentability of at least one of the challenged claims." Appx1857; Appx1861; Appx1865; Appx1870. The PTAB denied the petition challenging the '186 Patent for discretionary reasons. Appx1850.

The PTAB, however, instituted IPRs on the two petitions challenging the '809 Patent, based in part on the *Brands-Chaum* reference. It then upheld the '809 Patent, holding it would not have been obvious to skilled artisans to modify the *Brands-Chaum* computer to achieve the claimed invention. In particular, the PTAB ruled that *Brands-Chaum* specifically taught use of a single-bit signal to measure the distance between devices and that the multi-bit signals required to practice the claims here were incompatible. *Intel*, 2022 WL 1617415, at *7–11 (Appx4292–302); *Intel*, 2022 WL 1618012, at *7–11.

This Court affirmed. The Court noted that *Brands-Chaum* itself taught "that an '*essential* element' of its distance-bounding protocol 'consists of a ***single-bit*** challenge and rapid ***single-bit*** response.'" *Intel*, 2024 WL 725243, at *1 (emphasis in original) (quoting *Brands-Chaum*, Appx4128). The Court thus found that substantial evidence supported the PTAB's determination that "*Brands-Chaum*'s teachings are incompatible" with "multi-bit authentication protocols," such as those the patents require here. *Id.* The evidence showed that, in the prior art, "transmitting a multi-bit message would create unwanted delays, which in turn would render the distance measurement inaccurate and impair security." *Id.*

### B.     The ITC Finds the Asserted Claims Patent-Eligible Under § 101

Philips also instituted ITC proceedings against Intel and others to exclude infringing products. The ALJ rejected the respondents' argument that the asserted claims were patent-ineligible under § 101, and the Commission affirmed.

The ALJ first rejected the § 101 challenge in denying a request for summary adjudication. The asserted claims, the ALJ ruled, are "***plainly directed to eligible subject matter at Alice step one***" because they claim a specific improvement to receiver computer technology including "concrete" elements such as "a certificate that indicates the second [receiver] device is compliant with at least one compliance

rule." *Certain Digital Video-Capable Devices and Components Thereof*, No. 337-TA-1224, 2021 WL 2375006, at *1–2 (ITC May 24, 2021).[5]

The ALJ again rejected the § 101 challenge in the Initial Determination. The claimed invention, the ALJ ruled, is "particularized and concrete," including its "requirements for a certificate (which, as noted, has itself been construed with particularity) and compliance with a compliance rule (that is, a 'certain' rule for managing copyrighted content)." *Certain Digital Video-Capable Devices and Components Thereof*, No. 337-TA-1224, 2021 WL 6071754, at *63–64 (ITC Oct. 21, 2021). At *Alice* step one, the ALJ found "especially significant" the particularity of the claimed "threshold time requirement" (recited in the claims as the "predetermined time" and "a time difference between" elements), and the requirements that "multiple specific conditions … be satisfied, including satisfaction of a threshold time requirement, before actually 'providing' … protected content, as opposed to a single condition before 'identifying' a service's availability for some unspecified activity." *Id.* The Commission affirmed these findings and the asserted

---

[5] The ITC's § 101 decisions only address the patent-eligibility of the claims of the '186 and '564 Patents because Philips filed a motion to terminate the ITC Investigation with respect to the '809 Patent to simplify the investigation. *Id.* at *1. The ITC's reasoning applies equally to the '809 Patent, whose claim 1 the parties agree is representative of all asserted claims here. Appx3; Appx3392; Appx4041.

claims' patent-eligibility. *Certain Digital Video-Capable Devices and Components Thereof*, No. 337-TA-1224, 2022 WL 1302722, at *1, 2, 58 (ITC Apr. 26, 2022).[6]

## C. The District Court Holds That the Asserted Claims Are Not Patent-Eligible Under § 101

The district court initially stayed these cases pending the ITC Investigation, Appx303–05, but lifted the stay shortly after completion of the ITC and PTAB proceedings. Appx54 (D.I. 20); Appx775–76; *see also* Appx3040–72 (Scheduling Order). In August 2025, after the court resolved the parties' claim construction disputes and after the conclusion of fact and expert discovery, Intel filed a motion for summary judgment. The asserted claims, it urged, are ineligible for patent protection under § 101. Appx3366–68.

The district court granted Intel's motion. Appx7. In the court's view, the claims are "directed to the abstract idea of authenticated content transfer and do not contain an inventive concept that transforms this abstract idea into a patent-eligible application." Appx7.

The district court recognized that, under the claims, the first device (the transmitter) must receive a "certificate" from the receiving device, which the

---

[6] The Commission nonetheless found no violation of § 337, concluding that there was no infringement based on certain claim constructions the district court later declined to adopt. *Id.* at *10–16, 21–24; *see also Certain Digital Video-Capable Devices*, 2021 WL 6071754, at *28, 29–33. Philips did not appeal because the patents would have expired during the appeal, rendering the ITC powerless to grant Philips relief on remand.

transmitter uses to determine whether the second device (the receiver) is compliant with a set of compliance rules. Appx7. The court conceded that the transmitter must also send a first signal to the receiver and receive back a second signal, and that the second signal must be based on a shared "secret." Appx8. Finally, the court agreed that the transmitter then determines: (1) whether the second signal is based on the shared secret and (2) whether—based on that *same* secret-based second signal—the time difference between the first and second signal "is less than a predetermined time." Appx8. If the second signal is based on the shared secret and it arrives in less than the predetermined interval, the transmitter knows the second device is the authenticated device and within an appropriate proximity; at that point, the transmitter may share content with the receiver. Appx8.

Despite describing that precise sequence, including use of a shared secret, a second signal based on that secret, and measuring proximity based on the round-trip time using that second secret-based signal, the district court declared that the asserted claims recite "nothing more than a device that is capable of participating in a process for authenticated transfer." Appx8. Controlling access, it asserted, is a basic human activity. Appx8. The court rejected the argument that the claims "are directed to a specific technical improvement to then-existing computer systems" or an improvement to the *Brands-Chaum* computer. Appx9–10. The court urged that the claims do not describe a "specific technological improvement" and that the

"various embodiments incorporate well-known methods." Appx10. The court's *Alice* step one analysis did not address, however, whether using a shared secret as part of a time-based distance measurement was a well-known method. It did not mention the specification's explanation of its importance: "Because the common secret is being used for performing the distance measurement," the specification explains, "it can be ensured that … it is the distance between the right devices," *i.e.*, the transmitter and the authenticated receiver, "that is being measured." Appx35 (2:50–54). And the court did not address the use of a "predetermined time" interval for measuring proximity (as opposed to requiring the use of the speed of light), or the use of multi-bit rather than single-bit signals (as in *Brands-Chaum*). The court instead caricatured the claims as "directed to a result or effect that itself is the abstract idea." Appx9.

The district court acknowledged that this Court appeared to have upheld claims similar to the ones here in *CosmoKey.* Appx15. But the court "confess[ed]" that it was "unable to understand" why this Court had found those claims to be sufficiently " 'specific' or 'technological' " to be patent-***eligible***. Appx15.

The district court's *Alice* step two analysis (Appx16–18) was similar. The "distinction between the first and second steps of the *Alice* analysis," the court stated, "is porous to the extent that it is decipherable." Appx14 n.1. Without acknowledging MCP's additional evidence of unconventionality from outside the specification

itself, Appx4048–50; Appx4075–76 (¶¶ 50–54), the court held the patents "do[] not disclose[] a 'specific type' of either authentication or authenticated proximity determination" and "lack[] an inventive concept that removes [them] from the realm of abstract ideas." Appx17–18.

The court acknowledged the argument that the claims "perform[] a specific type of authentication—using a certificate … and then a specific type of authenticated proximity determination" based on whether "an RTT is less than a [predetermined] time," where the RTT measurement employs "a signal [modified] using a shared secret." Appx17 (ellipses in original). It did not deny that using a signal based on the shared secret in the round-trip time measurement "enables the transmitter to confirm it is measuring the proximity of the [authenticated] receiver and not some other (unauthorized) device." Appx17. And it did not, for example, dispute that the prior art, like the *Brands-Chaum* computer, taught away from the invention by requiring that the proximity determination be conducted using single-bit signals, rather than multi-bit signals as the invention requires. But it faulted the claims for not requiring a "specific type" of authentication of proximity determination. Appx17.

## SUMMARY OF ARGUMENT

The district court's § 101 decision departs from this Court's precedents. It cannot be reconciled with this Court's and the PTAB's prior holdings that the '809

Patents and related patents are non-obvious—and *a fortiori* unconventional—over the prior art. And it departs from the ITC's prior and better reasoned determination that the '186 Patent's claims are "plainly directed to eligible subject matter." *Certain Digital Video-Capable Devices*, 2021 WL 2375006, at *1–2. Reversal is warranted.

***First****,* the asserted claims are not directed to the abstract idea of "authenticated content transfer" at *Alice* step one. The patents do not simply claim using a generic computer as a tool to perform an abstract idea, such as an already existing economic or commercial practice. The patents instead identify specific technological problems in the prior art *Brands-Chaum* computer described in the patents' specification and prosecution histories and provide new and inventive technological solutions to those problems, as previously found by this Court, the PTAB, and the ITC.

The recited transmitter is configured for a specific type of secure authenticated distance measurement that could not be performed by prior art computers. The claimed transmitter is arranged to (1) determine the receiver's compliance with a set of compliance rules using a certificate, (2) provide a first signal to the receiver and determine whether the receiver's responsive, second signal is derived from a cryptographic "shared secret," and (3) perform a distance measurement based on the first signal ***and*** the authenticated secret-based second signal using a "predetermined time." This technology increases the security of the transmitter because it can ensure

that the authenticated receiver—and not an unauthenticated device that may undesirably copy or redistribute the content—is nearby the transmitter.

The claims are thus directed to specific improvements to computer technology. This Court has repeatedly confirmed that inventions that improve a computer's security, like those here, "can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem." *CosmoKey*, 15 F.4th at 1097 (quoting *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018)). As in *CosmoKey*, the "claims and specification [here] recite a specific improvement to authentication that increases security, prevents unauthorized access by a third party, [and] is easily implemented." *Id.* at 1098. The district court admitted to being unable to discern how the claims in *CosmoKey* were directed to a specific technology solution. But the analysis in *CosmoKey* confirms that the claims here were anything but abstract ideas.

The district court likewise erred by disregarding innovative claim elements by deeming them purely conventional. This Court has squarely held that courts analyzing *Alice* step one cannot "read out or ignore limitations … merely because they can be found in the prior art." *PowerBlock Holdings, Inc. v. iFit, Inc.*, 146 F.4th 1366, 1373 (Fed. Cir. 2025). The claim elements were anything but conventional, as this Court has already recognized. At the very least, the district court improperly

resolved material disputes of fact as to unconventionality against the non-moving party. The pleadings, the patents' specification, prior decisions of this Court, the PTAB, and the ITC, and other evidence of record all established that there was at least a material dispute of fact that the asserted claims provided a specific, unconventional technological solution over the prior art.

*Second*, the district court erred in concluding that the asserted claims lack an inventive concept at *Alice* step two. Here, the claimed subject matter is not a conventional combination of conventional elements. It instead includes at least one unconventional "inventive concept" that transforms the purportedly claimed abstract idea into patent-eligible subject matter. For example, the claims require, when determining proximity, using a signal derived from a "shared secret"; that ensures the distance is measured from the authenticated device (not an unauthenticated one that might be interposed closer in). The patents at least describe and claim a specific improvement over the then-existing *Brands-Chaum* computer. This Court and the PTAB confirmed the same when upholding validity over *Brands-Chaum* and other prior art. At a minimum, the district court erred by failing to find a genuine question of material fact as to whether the claims merely recite conventional combinations of conventional elements.

This Court reviews grants of summary judgment according to regional circuit law. *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1378 (Fed. Cir. 2024). The Third Circuit reviews such judgments *de novo*, "view[ing] the facts in the light most favorable to the nonmoving party and draw[ing] all inferences in that party's favor." *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1365 (Fed. Cir. 2019) (citing *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 978 F.3d 254, 257 (3d Cir. 2012)); *see also* Fed. R. Civ. P. 56(a).

Patent eligibility under § 101 is "a question of law that may contain underlying issues of fact." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1367 (Fed. Circ. 2020). Facts pertaining to patent eligibility, including "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent," "must be proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368–69 (Fed. Cir. 2018). The existence of genuine disputes regarding such facts precludes summary judgment based on § 101. *Id.* at 1370.

## ARGUMENT

Determining whether a patent covers a patent-ineligible "abstract idea[ ]" under § 101 involves a two-step inquiry. *Alice*, 573 U.S. at 217. At step one, the Court must "determine whether the claims at issue are ***directed to*** a patent-ineligible … abstract idea." *Id.* at 218. "The step one 'directed to' analysis … depends on an

accurate characterization of what the claims require and of what the patent[s] assert[]

to be the claimed advance." *TecSec, Inc. v. Adobe, Inc.*, 978 F.3d 1278, 1294 (Fed.

Cir. 2010). Even if the claims are "directed to" an "abstract idea" at step one, they

are patentable at step two if the claim "elements," considered "both individually and

as an ordered combination," contain an "inventive concept" that "transform[s] the

nature of the claim into a patent-eligible application" of that idea. *Alice*, 573 U.S. at

217.

The district court erred at both steps. At step one, the court overgeneralized

the patents' claims as being directed to "nothing more than a device that is capable

of participating in a process for authenticated content transfer," Appx8, and made

unsupported factual findings that the patents do not disclose "a specific

technological improvement of the transmitter or *Brands-Chaum* device," Appx10.

But the court disregarded what the claims actually require and the advance they

reflect over the prior art. The court also deemed claim elements purely

"conventional" without evidentiary or logical basis. At step two, the court held that

the claim limitations, "whether considered individually or as an ordered

combination," failed to "'transform' the claimed abstract idea [of authenticated

content transfer] into patent-eligible subject matter." Appx16. But the court's

analysis was flawed. It disregarded the patents' teachings that the claimed

certificate-based authentication and authenticated distance-measurement elements

are specific inventive concepts, both individually and as an ordered combination. And it failed to consider MCP's further evidence of unconventionality *at all*.

## I. THE '809 AND '186 PATENTS ARE "DIRECTED TO" CONCRETE IMPROVEMENTS TO TECHNOLOGY FOR SECURE TRANSFER OF PROTECTED DIGITAL CONTENT—NOT AN ABSTRACT IDEA

### A. The '809 and '186 Patents Claim a Specific Technological Solution for Securely Transferring Protected Digital Content Using Authenticated Distance Measurement

#### 1. The Asserted Claims Are Directed to a Patent-Eligible Improvement to the *Brands-Chaum* Distance-Bounding Computer

*Alice* step one requires courts to examine "what the patent asserts to be the claimed advance," *TecSec*, 978 F.3d at 1294, crediting "the written description['s]" explanation of "the technical advantages offered by" the claimed invention, *CardioNet*, 955 F.3d at 1369; *see also Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) (considering "the specification's teachings that the claimed invention achieves other benefits over conventional databases"). This Court has repeatedly acknowledged that claims directed to "'improving [computer] security,'" "'can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem.'" *CosmoKey*, 15 F.4th at 1099 (quoting *Ancora*, 908 F.3d at 1348); *see also Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1304–05 (Fed. Cir. 2018).

Here, the patents expressly teach that the claimed invention provides a technological improvement in security over the *Brands-Chaum* computer. *Brands-*

*Chaum* provided a mechanism for determining proximity—distance bounding. Appx4128–29; *supra* pp. 6–8. The patents explain that *Brands-Chaum*, however, "does not allow authenticated device compliancy testing," and that the claimed invention provides "a solution to the problem of performing a secure transfer of content within a limited distance." Appx28 (2:32–37). The Court must credit those statements. *See CardioNet*, 955 F.3d at 1371; *Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022).

This Court itself has described the invention as a significant advance over *Brands-Chaum*. In particular, in *Intel*, 2024 WL 725243, this Court upheld the PTAB's finding that the '809 Patent represents a nonobvious advance in digital content protection technology. *Id.* at *1. The patent, this Court explained, makes that advance by combining, in a nonobvious way, the "authentication protocol" with "the broad distance-measurement concept … taught in *Brands-Chaum*." *Id.*

The Court explained precisely why that was so. The *Brands-Chaum* computer relied on a series of rapid, single-bit exchanges—and how long it took them to move between the two devices—to calculate a distance between devices using the speed of light. Appx4128–29; *supra* pp. 6–8. As this Court explained, *Brands-Chaum* itself taught "that an '***essential*** element' of its distance-bounding protocol 'consists of a ***single-bit*** challenge and rapid ***single-bit*** response.'" *Intel*, 2024 WL 725243, at *1 (emphasis in original) (quoting *Brands-Chaum*, Appx2128). The evidence showed

29

that, in the prior art, "transmitting a ***multi-bit*** message would create unwanted delays, which in turn would render the distance measurement inaccurate and impair security." *Id*. As a result, "*Brands-Chaum*'s teachings are incompatible" with "multi-bit authentication protocols." *Id.* Because ***authenticated*** device compliancy testing requires the use of multi-bit exchanges, *Brands-Chaum* could only prove that two ***anonymous*** devices were near each other. Appx28(2:31–39).

The claims here provide a "solution" to *Brands-Chaum*'s shortcomings. Appx28(2:35). They allow for the "***secure*** transfer of content within a limited distance," Appx28(2:32–37), using multi-bit messages so the receiving "device can first be tested on compliancy before a distance measurement is executed," Appx28(2:50–55). This use of multi-bit messages is made possible because, unlike *Brands-Chaum*, the claimed invention does not require the use of the speed of light to perform distance-bounding, but instead uses a "predetermined time" protocol that is more tolerant of delays. *See supra* pp. 8–15. That is a concrete solution to a specific technological problem.

The claim limitations add further specificity. The first element involves "checking if the identification of the [receiver] is compliant with an expected identification." Appx29(3:56–61). To perform that element, '809 Patent claim 1 recites that the transmitter "receive[s] a certificate of the second device [the receiver], the certificate providing information regarding the second device" and

"determine[s] whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate." *E.g.*, Appx29–31 (Fig. 2, 3:56–61, 5:60–6:20, elements 1[c]–[d]). Under the stipulated claim construction, the certificate must include "at least the entity's distinguishing identifier and public key, and [be] signed by a certification authority to guard against forgery." Appx2928; *see also* Appx28–29 (1:65–2:2, 3:40–44, 3:56–61).

To further ensure the transaction's security, the invention requires that the transmitter and receiver "share" a cryptographic "common secret" that is also to be "used in performing the distance measurement" between the two devices. Appx28 (2:38–44). The transmitter can share the secret with the receiver after determining that the receiver "is complaint" with the "predetermined compliance rules." Appx29 (3:40–47). That sharing process can be performed securely using "key transport mechanisms" and "key agreement protocol[s]." Appx29 (3:48–55).

The claim thus recites that, after the receiver has been found compliant with the set of compliance rules, the system performs the distance-bounding determination *using the shared secret*. The transmitter "provide[s] a first signal" to the receiver "depending when the [receiver] is determined to be compliant with the set of compliance rules" and in return "receive[s] a second signal" from the receiver (element 1[e]–[f]). The transmitter then "determine[s] whether the second signal" it received from the receiver "is derived from [the devices' shared] secret"

(element 1[g]). If so, the transmitter then "determine[s] whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time" (element 1[h]). As construed, "predetermined time" means "a time interval selected to ensure that the first and second communication devices are sufficiently near one another to permit access to the protected content, where sufficiently near refers to physical proximity." Appx2928; *see also* Appx2937 (19:12–20:6). The transmitter then "allow[s] the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time" (element 1[i]).

The patents teach that the transmitter's receipt of the receiver's second signal within such a "predetermined time" enables a determination of physical proximity that can prevent unauthorized copying of licensed content, ensuring the content remains within a local network, rather than being retransmitted over the Internet. Appx28 (2:10–22). And the second signal, created based on the shared secret, provides the transmitter with information it can use to determine that the second signal—used for distance bounding—came from the receiver that has been authenticated as compliant based on its certificate, rather than an unauthenticated device that may copy or redistribute the content without authorization. Appx28–30 (2:58–65, 5:36–43, 6:30–35).

The claim elements thus provide a specific solution to the specific problem with the then-existing *Brands-Chaum* computer, which "d[id] not allow authenticated device compliancy testing and [was] not efficient when two devices must also authenticate each other." Appx28 (2:32–34). Contrary to the district court, this solution is not "directed to a result or effect that itself is the abstract idea" (Appx9), but instead provides specific ways to achieve the invention's goals. For example, because the term "certificate" was construed as "information containing at least the entity's distinguishing identifier and public key, and signed by a certification authority to guard against forgery," the claims are not merely directed to the result of obtaining a certificate-based authentication. They do not preempt all forms of using a certificate to authenticate a receiver as compliant with a set of compliance rules. Similarly, the claims are not merely directed to the result of limiting the distance between the receiver and transmitter. They do not preempt other ways of distance measurement, such as using single bit messages (*Brands-Chaum*), or other ways of restricting content distribution to within a proximity, such as by restricting the number of network "hops." Appx4205 (FCC order discussing technology that "localiz[es] [] content through a limit of 3 on the Time to Live ('TTL') field in IP packets, which represents the number of routers through which an IP packet can pass before it is discarded"); Appx4209–10 (same). They instead require a particular and innovative sequence of steps, requiring (for example)

performing a distance-bounding determination that employs the round-trip time of a signal that is based on a shared secret—ensuring that distance measured is to an authenticated, compliant device rather than a different, unauthenticated (and potentially noncompliant) one.

### 2. The Asserted Claims Represent the Type of Technological Improvement This Court Has Found Patent-Eligible at Step One

This Court has repeatedly held that claims for "[i]mproving security"—including security "against a computer's unauthorized use of a program—can be a non-abstract computer functionality if done by a specific technique that departs from earlier approaches to solve a specific computer problem." *Ancora*, 908 F.3d at 1348. The claims here for improving digital content transfer security are likewise patent-eligible at *Alice* step one.

*Ancora*, like this case, involved patent claims for "limiting a computer's running of software not authorized for that computer to run." *Id.* at 1344. The patent there restricted the operation of software to computers that were licensed to use the software by requiring a match between a "key," which was "a unique identification code for the ***computer***," and a "license record," which was "associated with a particular ***application***." *Id.* at 1345. The "innovation of the patent relate[d] to where the license record is stored in the computer." *Id.* The patent unexpectedly stored the license record in "BIOS memory," which is "typically used for storing programs that assist in the start-up of a computer, not verification structures" for determining

whether software is licensed. *Id.* That method "improve[d] security … because successfully hacking BIOS memory … is much harder than hacking the memory used by the prior art to store license verification." *Id.* The Court found that was "not directed to an abstract idea" at step one because it "addresses a technological problem with computers: vulnerability of license-authorization software to hacking." *Id.* at 1348–49.

Likewise, *CosmoKey* involved a patent for an "improvement in computer verification and authentication techniques." 15 F.4th at 1097. This Court explained that "the claims and written description suggest that the focus of the claimed advance is activation of the authentication function, communication of the activation within a predetermined time, and automatic deactivation of the authentication function, such that the invention provides enhanced security and low complexity with minimal user input." *Id.* The claims included the steps of:

> (1) "as a criterion for deciding whether the authentication to the transaction shall be granted or denied, having the authentication device check whether a predetermined time relation exists between the transmission of the user identification and a response from the second communication channel";
>
> (2) "ensuring that the authentication function is normally inactive and is activated by the user only preliminarily for the transaction"; followed by
>
> (3) "ensuring that said response from the second communication channel includes information that the authentication function is active"; and

> (4) "thereafter ensuring that the authentication function is automatically deactivated."

*Id.* (line breaks added). The claims, this Court found, provided "a specific set of ordered steps that go beyond the abstract idea" of authentication based on verification of identity. *Id.* at 1099. This Court found the claims at issue patent-eligible because the "claims and specification recite a specific improvement to authentication that increases security, prevents unauthorized access by a third party, [and] is easily implemented." *Id.* at 1098.[7]

And this Court, in *TecSec*, upheld a patent for "multi-level security of various kinds of files being transmitted in a data network" as non-abstract at step one. 978 F.3d at 1282. The patent there claimed "a method in which a digital object—*e.g.*, a document, video, or spreadsheet—is assigned a level of security that corresponds to a certain combination of access controls and encryption. The encrypted object can then be embedded or 'nested' within a 'container object,'" which can also be "encrypted and access-controlled [to] provide[] a second layer of security." *Id.* The Court found the claim was not merely directed to the abstract idea of "multilevel security." *Id.* at 1295. The claim did not simply use "multiple levels of encryption,"

---

[7] *CosmoKey* was decided at *Alice* step two, but there are "overlaps" between the steps, and this Court has previously found that whether a claim "passes muster at step one" may be assessed in light of this Court's "holdings under step two." *Ancora*, 908 F.3d at 1349. That is true with *CosmoKey* here. Indeed, in *CosmoKey*, the Court stated, without deciding the issue, that it was "not convinced" the patent was directed to an abstract idea at step one. *See* 15 F.4th at 1097.

but required "accessing an 'object-oriented key manager' and specified uses of a 'label' as well as encryption." *Id.* The Court found that these features of the claims "are directed at solving a problem specific to computer data networks," namely "allowing for the simultaneous transmission of secure information to a large group of recipients connected to a decentralized network … but without [allowing] uniform access to all data by all recipients." *Id.* The Court found the claims non-abstract at step one because "the claims are directed to improving a basic function of a computer data-distribution network, namely, network security." *Id.* at 1296.

Like the claims in *Ancora*, *CosmoKey*, and *TecSec*, the claims here are not merely directed to "[i]mproving security" or providing security "against a computer's unauthorized use of" digital content. *Ancora*, 908 F.3d at 1348. Like the claims in *Ancora*, *CosmoKey*, and *TecSec*, the claims here improve security by employing "a specific technique that departs from earlier approaches to solve a specific computer problem." *Ancora*, 908 F.3d at 1348. As explained above (at pp. 5–15, §I.A.1), the claims here overcome shortcomings of the *Brands-Chaum* computer to provide secure distance measurement before allowing a device to access protected digital content. They do so using specific, ordered steps requiring the transmitter to (1) determine the receiver's compliance with a set of compliance rules using a certificate, (2) provide a first signal to the receiver and determine whether the receiver's responsive second signal is derived from a cryptographic "shared

secret," and (3) perform a distance measurement based on the first signal and the authenticated second signal using a "predetermined time." As a result, like the claims in *Ancora*, *CosmoKey*, and *TecSec*, the claims here are directed to "a non-abstract computer functionality" at step one. *Ancora*, 908 F.3d at 1348.

## B. The District Court Committed Multiple Errors in Finding the Claims Directed to an Abstract Idea at Step One

Without addressing those specifics, the district court held that the claims are "directed to the abstract idea of authenticated content transfer." Appx7. The court, however, misconstrued both the patents and this Court's § 101 precedent.

### 1. The District Court's Analysis of the Claim Limitations Defies Both Precedent and the Patents' Disclosures

As this Court has repeatedly held, courts cannot "ignore what plainly are important aspects of the claims and the focus of the claimed advance in the combination." *TecSec*, 978 F.3d at 1296; *see also McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) ("a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps"). Yet that is precisely what the district court did.

The district court urged that the claims and "the patents' shared written description discloses no specific means or method that improves the relevant technology, but instead" are "'directed to a result or effect that itself is the abstract idea.'" Appx19 (quoting *McRO*, 837 F.3d at 1314 (alteration in original)). But that

assertion is self-evidently incorrect. The "claims do not simply recite, without more, the mere desired result" of performing authenticated distance measurement. *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019). As explained in detail above, the claims recite specific, ordered steps— wholly nonobvious techniques—to achieve that goal. The claims require the transmitter to implement a novel distance-measurement protocol using multi-bit messages that were incompatible with prior art solutions to (1) determine the receiver's compliance with a set of compliance rules using a certificate, and (2) provide a first signal to the receiver and determine whether the receiver's responsive second signal is derived from a cryptographic "shared secret," and (3) perform the distance measurement using that shared-secret based second signal. Doing so allows the transmitter to ensure authentication and that the distance measurement is performed with an authenticated device, rather than a device that is not authorized to access the protected content. *See supra* pp. 8–15, § I.A.1. The claims also recite (4) a novel distance-measurement protocol using a "predetermined time" that makes use of those multi-bit authentication messages possible. *See id.* The claim language itself thus "recite[s] a sufficiently specific implementation" of secure distance measurement to render the claims non-abstract at step one, *Koninklijke*, 942 F.3d at 1151. In contrast with the district court, the ITC recognized that these elements rendered the claims specific and nonabstract. *Certain Digital Video-*

*Capable Devices*, 2021 WL 2375006, at \*1–2; *Certain Digital Video-Capable Devices*, 2021 WL 6071754, at \*63–64. The PTAB and this Court have recognized that they rendered the invention a nonobvious advance over the prior art. *See supra* pp.16–17.

The district court demanded more. It wanted, for example, the patents' specification to provide a "written description of a specific technological improvement of the transmitter or *Brands-Chaum* device." Appx10. But no law requires that the specification say, "here is why the claims are unconventional" for the claims to be found non-abstract under § 101. Yet the patents here do just that. As explained above, the patents explain that the then-state-of-the-art *Brands-Chaum* distance-bounding computer "does not allow authenticated device compliancy testing and is not efficient when two devices must also authenticate each other." Appx28 (2:32–34). The patents also explain that they provide "a solution to the problem of performing a secure transfer of content within a limited distance" through claim elements that require a certificate indicating compliance with a set of compliance rules and sending a second signal that has been modified using a shared secret. Appx28 (2:35–37); *see supra* pp. 8–15, § I.A.1. The district court was not entitled to ignore those statements to resolve the factual question of conventionality in movants' favor at the summary judgment stage. Fed. R. Civ P. 56(a); *Berkheimer*, 881 F.3d at 1368–70.

The district court further erred in stating that "neither claim 1 nor anything else in the #809 patent's specification explains how the claimed device is configured to achieve the claimed authenticated content transfer." Appx14. Once the patent has described specific, concrete elements for performing the invention, any further question of whether the patent sufficiently discloses how to ***implement*** those claim elements—whether it teaches skilled artisans precisely how to "make and use" the invention—is a question of enablement under § 112, not abstraction under § 101.

In any event, the patent ***does*** disclose how to implement all of its elements. It discloses that "[t]he authentication and exchange of secret could be performed using the protocols described in some known ISO standards *e.g.* ISO 9798 and ISO 11770." Appx30 (5:60–62). It then provides a specific "example" of how "the first device could authenticate the second device" for sharing the secret:

> First device→Second device: $R_B$||Text 1
> where $R_B$ is a random number
> Second device→First device: CertA||TokenAB
> Where CertA is a certificate of A
> TokenAB=$R_A$||$R_B$||B||Text3||s$S_A$($R_A$||$R_B$||B||Text2)
> $R_A$ is a random number
> Indentifier B is an option
> s$S_A$ is a signature set by A using private key $S_A$
> If TokenAB is replaced with the token as specified in ISO 11770-3 we at the same time can do secret key exchange. We can use this by substituting Text2 by:
> Text2:=e$P_B$(A||K||Text2)||Text3
> Where e$P_B$ is encrypted with Public key B
> A is identifier of A
> K is a secret to be exchanged

Appx30(5:62–6:12). The patent likewise discloses that the "signal could be modified by XORing the chips … of the direct sequence code of the bits of the secret." Appx30(5:54–58). As for the certificate, the claims require that it (1) be received and analyzed before the transmitter issues a first signal; (2) "provid[e] information regarding the second device"; and (3) be used to "determine whether the second device is compliant with a set of compliance rules utilizing" the information therein regarding the second device (elements 1[c]–[d]). The stipulated construction further defines the "certificate" as "information containing at least the entity's distinguishing identifier and public key, and signed by a certification authority to guard against forgery." Appx2928. The district court's view that the patent does not disclose how the recited claim elements function as a technological matter, Appx13, is unfounded.

Indeed, despite stating that the patents failed to disclose how to perform the claim elements as a technological matter, the district court ultimately admitted that the opposite was true. Appx10–11. In the court's view, however, those disclosures did not count—and the corresponding claim elements thus could be disregarded—because they "incorporate well-known methods, conventional computer components, and ISO standards." Appx10. That reasoning violates a basic tenet of § 101 law: A court is not free to "ignore limitations" in the claims "merely because they can be found in the prior art." *PowerBlock*, 146 F.4th at 1373; *see also*

*Berkheimer*, 881 F.3d at 1369 ("Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination. … The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional."). It has long been settled that it is "inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the [§ 101] analysis." *Diamond v. Diehr*, 450 U.S. 175, 188 (1981). Yet that is precisely what the district court did.

The district court also clearly erred in failing to appreciate "the focus of the claimed advance ***in the combination***." *TecSec*, 978 F.3d at 1296. The court asserted that "the patents' shared written description itself makes clear that at the time the applications for the patents were filed, '[t]echnology to perform device authentication and encrypted transfer [wa]s available and [wa]s called a secure authenticated channel (SAC).'" Appx11 (citing Appx28(2:8–10)) (alterations in original). But the court never explained how such a previously available secure authenticated channel could also be used to perform a secure distance measurement. It did not suggest that any prior art did so using the elements recited and claimed in these patents. And the court identified no evidence that anyone had ever done so. It did not suggest, and could not suggest, that it was conventional to use a multi-bit, secret-based signal to ensure the distance measurement was addressing the proximity of an ***authenticated*** device.

Indeed, this Court's decision upholding the '809 Patent against an obviousness challenge confirms that its highly specific way of combining a particular set of authentication protocols with a distance-bounding protocol is nonconventional. *Intel*, 2024 WL 725243, at *1. There was no basis, especially at the summary judgment stage where facts must be viewed in the light most favorable to the nonmoving party, to conclude that these claimed techniques were well-known or conventional as a matter of law. *Berkheimer*, 881 F.3d at 1368–70. The court provided no evidence—zero—suggesting otherwise.

## 2.    The District Court Misapplied This Court's § 101 Precedent

The district court's reliance on its understanding of this Court's precedents, such as *Universal Secure Registry* and *Prism Technologies*, further undermines its decision. The asserted claims are not remotely "analogous" to the claims the Court "found to be invalid under § 101" in those cases. Appx13–14.

In *Universal Secure Registry LLC v. Apple Inc.*, this Court found the challenged claims abstract because they "generically provide[d] for the collection of biometric information to generate a first authentication information, and then authenticating a user using both the biometric-information-derived first authentication and a second authentication information," which "[t]he specification … disclose[d] … [wa]s conventional." 10 F.4th 1342, 1354 (Fed. Cir. 2021). The Court thus concluded that "[t]he claims … were simply directed to combining these

long-standing, well-known authentication techniques to achieve the expected result of increased security no greater than the sum of the security provided by each technique alone." *CosmoKey*, 15 F.4th at 1096 (explaining and distinguishing *Universal Secure Registry*).

Similarly, in *Prism Technologies LLC v. T-Mobile USA, Inc.*, this Court found the challenged claims were "directed to the abstract idea of 'providing restricted access to resources'" because the claims "merely recited 'receiving' a user identify, 'authenticating' the user identify, 'authorizing' the user, and 'permitting access' to the user," and did not cover a "concrete, specific solution." 696 F. App'x 1014, 1016–17 (Fed. Cir. 2017).

The district court did not meaningfully compare the specific claim limitations here with the claims in *Universal Secure Registry* and *Prism Technologies*. *See* Appx11–13. Instead, it found the claims analogous based on its view that "the #809 patent similarly provides no description of a specific technical solution by which the first device is arranged to transmit protected information to the first device." Appx12. That fails for all the reasons above: The claims here do provide specific, concrete steps for performing authenticated distance measurement. *See supra* pp. 8–15, §I.A.1. The district court's contrary assertion improperly disregards both the claims' specific requirements and the benefits they achieve. It deems all the elements conventional without explaining why specific requirements are conventional. And it

largely ignores specific improvements over the prior art *Brands-Chaum* computer that *Brands-Chaum* teaches against. *See supra* pp. 19–22, § I.B.1.

The district court's effort to distinguish cases like *Ancora*, *TecSec*, and others fails for precisely the same reasons: The district court erroneously thought that, unlike the patents in those cases, the claims here do not "offer[ ] specific technical improvements to computer security." Appx13. As explained above (at pp. 8–15), the claims offer technical improvements to computer security that are just as concrete and specific as in those cases.

Ultimately, the district court acknowledged that it was unable to discern the line between patent-eligible and patent-ineligible subject matter under this Court's precedent. The district court "confess[ed]" that it was "unable to understand" how either the problem or the solution held patent-eligible in *CosmoKey*—comparable to the claims here—is "more 'specific' or 'technological' than those" found ineligible in *Universal Secure Registry*. Appx15. That professed inability "to understand" what constitutes a patent-eligible technological improvement tainted the district court's entire step one analysis. Reversal is warranted.

## II. THE ASSERTED CLAIMS CONTAIN AN "INVENTIVE CONCEPT" THAT REPRESENTS A PATENTABLE ADVANCE OVER THE PRIOR ART UNDER *ALICE* STEP TWO

Because the asserted claims are not directed to an abstract idea at *Alice* step one, this Court need go no further; the claims should be upheld. *See Enfish*, 822 F.3d

at 1339. But even if the claims were deemed directed to the "abstract idea of authenticated content transfer" at step one, Appx7, they are patent-eligible at step two. The "elements" of the claims, considered "both individually as an ordered combination," contain multiple "inventive concept[s]" that "transform the nature of the claim[s] into a patent-eligible application" of authenticated content transfer. *Alice*, 573 U.S. at 217.

## A. The Asserted Claims Recite a Specific, Inventive Solution to Authenticated Content Transfer, Whether the Elements Are Considered Individually or in Combination

As the specification explains, the patents here contain inventive concepts. Contrary to prior-art teachings, they "combine[] a distance measurement protocol with an authentication protocol" to offer a "solution to the problem of performing *secure* transfer of content within a limited distance." Appx28 (2:35–37, 2:50–51). As the patents further explain, and as this Court's prior decision affirms, the claims define an advance over the then-state-of-the-art *Brands-Chaum* distance-bounding computer. *See* Appx28 (2:26–34).

The claims recite "more than [the] mere result" of performing authenticated content transfer using a distance-measurement protocol and an authentication protocol. *Finjan*, 879 F.3d at 1305. And they provide more than merely an instruction to combine the two. The "highly granular" set of steps recited in the

claims describe a specific, concrete methodology, not a mere abstraction. *Id.* at 1304. The claims are patent-eligible under § 101.

### 1. The Transmitter's Use of a Certificate to Authenticate the Receiver as Compliant With a Set of Compliance Rules (Claim Elements 1[c]–[e]) Was Inventive

Claim elements 1[c]–[e] require that the transmitter receive a certificate from the receiver and use information in that certificate to authenticate that the receiver is compliant with a set of compliance rules. *See supra* pp. 8–15, § I.A.1. The claims require that the transmitter does so at a specific time, in a specific way.

The claims require that the transmitter, at the outset, "receive a certificate of the second device [the receiver], the certificate providing information regarding the second device" and then "determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate" prior to "provid[ing] a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules." *E.g.*, Appx29–31 (Fig. 2, 3:62–67, 5:63–6:23, elements 1[c]–[e]). Under the stipulated claim construction, the claimed certificate is subject to particular requirements: It must include "at least the entity's distinguishing identifier and public key, and [be] signed by a certification authority to guard against forgery." Appx2928; *see also* Appx28–29 (1:65–2:2, 3:40–44, 3:56–61). The use of the specific certificate enables the

transmitter to ensure that the receiver "really is the device that it should be." Appx29 (3:56–61).

The claimed use of a certificate for authentication was unconventional in and of itself. *See, e.g.*, Appx4587 (92:2–20) (inventor confirming he invented a "specific form of compliancy testing with a digital certificate" that was not known in the art); *Certain Digital Video-Capable Devices*, 2021 WL 6071754, at \*71, 74–75 (Appx4282–86) (finding the claimed certificate-based authentication elements nonobvious). While the patents disclose that authentication "could be performed using the protocols described in some known ISO standards *e.g.* ISO 9798 and ISO 11770," Appx30 (5:60–62), there is no evidence that these standards related to any compliancy determination (they do not).

Moreover, the patents explain that the then-existing *Brands-Chaum* distance-bounding computer "does not allow authenticated device compliancy testing." Appx28 (2:32–33); *see also Intel*, 2024 WL 725243, at \*1. As discussed above, *Brands-Chaum* relied on a series of rapid single-bit exchanges to calculate a distance between devices. *See supra* pp. 6–8; Appx4128–29. That did not allow for an authenticated distance measurement to a compliant device, which would require multi-bit exchanges. *Id. Brands-Chaum* thus could only prove that two ***anonymous*** devices were near each other. The invention here solved that problem by first authenticating the receiver as compliant, which enables the creation of a secure

channel for sharing the multi-bit first and second signals and secret necessary for a secure, authenticated distance measurement. Appx28–30 (2:51–55, 3:48–55, 5:25–35). The claimed use of the certificate itself thus represents a patent-eligible "inventive concept." *Alice*, 573 U.S. at 217.

### 2. The Transmitter's Use of a Second Signal Based on a Shared Secret to Enable Authenticated Distance Assessment (Claim Elements 1[e]–[i]) Was Inventive

After the transmitter has used the receiver's certificate to authenticate the receiver as compliant with a set of compliance rules, the claims require yet another layer of authentication using a cryptographic "shared secret" to ensure the distance measurement is performed *vis-à-vis* an authenticated receiver, rather than another device. *See supra* pp. 8–15, §I.A.1. And the claims perform the distance measurement in a way different from the *Brands-Chaum* computer that makes the multi-bit authentication protocols possible. *See supra* pp. 8–15, §I.A.1.

Claim elements 1[e]–[i] recite that, after the transmitter has authenticated the receiver as compliant with the set of compliance rules, the system performs the distance-measurement determination using a shared secret. The transmitter provides a "first signal" to the receiver, and receives back a "second signal" from the receiver (elements 1[e]–[f]). The transmitter "determines [whether] the second signal is derived from the [devices' shared] secret" (element 1[g]). The patents teach that the shared secret enables the transmitter to determine that the second signal was created

by the authenticated receiver; it can thus ensure the time difference between the transmitter sending the first signal and receiving the second signal represents the RTT between the transmitter and the authenticated receiver (and not some other, unauthenticated device). Appx28–30 (2:45–49, 3:4–14, 6:30–50); *see also* Appx4589 (110:10-14) (inventor confirming it is "important to [the] invention that the common secret be shared before performing the distance measurement"); Appx4603 (183:10–184:7) (inventor testifying that using a second signal modified by a shared secret was not known prior to invention).

The transmitter further "determine[s] whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time" (element 1[h]). As construed, "predetermined time" means "a time interval selected to ensure that the first and second communication devices are sufficiently near one another to permit access to the protected content, where sufficiently near refers to physical proximity." Appx2928; *see also* Appx2937 (19:12–20:6). The patents teach that the transmitter's receipt of the receiver's second signal within such a "predetermined time" enables a determination of physical proximity that can prevent unauthorized copying of licensed content by ensuring that the content remains within a local network, rather than being retransmitted over the Internet. Appx28 (2:10–22). The transmitter "allow[s] the protected content to be provided to

the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time" (element 1[i]).

As discussed above (at §I.B.1), the specification teaches that modification of signals could be made according to known techniques. Appx29(3:30–36). But nothing in the record suggests that it was conventional to perform such operations in connection with a distance measurement to confirm the distance is being measured to the appropriate, authenticated device. To the contrary, these elements were unconventional over the then-existing *Brands-Chaum* computer (*see supra* pp.8–15, §I.A.1), which relied on a series of rapid single-bit exchanges to calculate a distance between devices using the speed of light. *See* Appx4128–29. The specification thus teaches that *Brands-Chaum* could not perform an ***authenticated*** proximity determination, which required the use of multi-bit exchanges. Appx28(2:26–55); *see also supra* pp.6–15, §I.A.1 (explaining the technological improvement over the *Brands-Chaum* computer).

Moreover, as this Court and the PTAB confirmed, *Brands-Chaum* could not be modified to perform an authenticated proximity determination because the modifications necessary for such a determination—*e.g.*, using a multi-bit return signal created based on a secret—"would create unwanted delays, which in turn would render the distance measurement inaccurate and impair security." *Intel*, 2024 WL 725243, at *1. And *Brands-Chaum* certainly did not disclose using a signal that

was based on a "shared secret" when conducting a proximity determination. That ensures the distance to the authenticated device, not some other device, is measured. But it requires multi-bit exchanges that *Brands-Chaum* warns against. *See supra* pp.6–16.

The claimed use of a "predetermined time" for physical proximity determination—*i.e.*, "a time interval selected to ensure that the first and second communication devices are sufficiently near one another to permit access to the protected content, where sufficiently near refers to physical proximity," Appx2928—was also unconventional. Appx28–31 (2:56–3:14, 3:62–4:5, 5:36–47, 50–59, elements 1[h]–[i]). Indeed, it is the use of the "predetermined time" to perform the distance measurement, rather than requiring the use of the speed of light as in *Brands-Chaum*, that makes the use of the claimed multi-bit authentication protocols—the certificate and the modified second signal—possible. *See supra* pp.8–15, § I.A.1.

The record evidence confirms that the comparison of round-trip time (or "RTT") to a "predetermined time," to decide whether a "receiving device is 'close enough' to the transmitting device," was unconventional. *See supra* pp.8–15. The main participants in the digital content protection industry—including Intel, Warner Brothers, Sony, and Toshiba—did not purport to discover the use of such a "predetermined time" until after the patents' 2002 priority date. Appx4256–

27(¶¶70–71), Appx4531–34(¶¶91–93), Appx4535–37(¶¶96–98). For example, when promoting its later Digital Transmission Content Protection over Internet Protocol ("DTCP-IP") content protection system, Intel admitted it did not "work out" this "localization problem" until 2004. Appx4190; *see also* Appx4199–200 (2004 submission to FCC promoting DTCP-IP's ability to prevent "[r]edistribution to the public via the Internet (*i.e.*, outside home and personal networks)" and to "thwart or frustrate attempts to send DTCP-protected content to noncompliant devices"); Appx4202 (same); Appx4210 (2004 FCC Order confirming that DTCP-IP's use of an RTT "adequately restrict[s] the scope of redistribution"). Each of Warner Brothers, Sony, and Toshiba likewise described the use of such a predetermined time as inventive in their later patent filings. Appx4159–61 (Warner Brothers patent describing use of RTT to confirm a "receiving device is 'close enough' to the transmitting device [to be] authorized to decode/store/playback a specified amount of content"); Appx4150 (same); Appx4163–64 (Sony patent describing comparing RTT to predetermined time to permit exchange of content); Appx4156–57 (same); Appx4152–54 (Toshiba patent describing comparing RTT to "predetermined value" to determine whether to allow transmission of protected audio-visual data); Appx4156–57 (same).

As explained above, this Court and the PTAB found these elements nonobvious. *See Intel*, 2022 WL 1617415, at *7–11 (Appx4292–302); *Intel*, 2022

WL 1618012, at *7–11; *Intel*, 2024 WL 725243, at *1; *TCL Indus. Holdings Co. v. Koninklijke Philips N.V.*, IPR2021-00497, Paper 10, at 17–20 (PTAB Aug. 17, 2021) (upholding '564 Patent's validity because petitioner failed to demonstrate obviousness to combine a certificate for validation with a proximity determination) (Appx1864–68); *see also* Appx1856–59, Appx1860–63, and Appx1869–71 (same regarding '977 Patent). That raises at least a dispute of material fact as to whether these elements provide an inventive concept.

### 3. The Ordered Combination of Claim Elements Was Inventive

Even if each of the individual foregoing techniques were conventional—and they are not—the specific ordered combination here provides an inventive concept. "[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349–50 (Fed. Cir. 2016). The specification emphasizes that the ordered "combin[ation of] a distance bounding protocol with an authentication protocol" solves the problem of prior distance-bounding protocols— that they do "not allow authenticated device compliancy testing" and are not "efficient when two devices must also authenticate each other." Appx28 (2:32–34, 2:50–51).[8] Any disputes regarding the accuracy of those statements must be resolved

---

[8] *See also* Appx2579 (94:8–12) (inventor confirming he had "the idea of combining [a secure authenticated channel] between two entities and [a] technique to measure geographical distance between two entities"); Appx2592 (88:7–15) (inventor

55

in patent owner's favor at the summary judgment stage. *Berkheimer*, 881 F.3d at 1368–70.

The specification teaches that a transmitter first authenticating a receiver as compliant with a set of compliance rules enables the establishment of a secure channel between the transmitter and the receiver, and a shared secret can then be used to perform an authenticated distance measurement. For example, the patents explain that the "method combines a distance measurement protocol with an authentication protocol." *E.g.*, Appx28 (2:50–51). "This enables authenticated device compliancy testing and is efficient, because a secure channel is anyhow needed to enable secure communication between devices and a device can first be tested on compliancy before a distance measurement is executed." Appx28 (2:51–55). The specification further teaches how each of these techniques can be performed, *e.g.*, Appx30 (5:19–6:59), and the ITC found that these techniques are nonabstract and claimed with particularity, *Certain Digital Video-Capable Devices*, 2021 WL 6071754, at *63–64.

---

confirming that "the idea [he] came up with … combine[d] two things. … The first one being a distance measurement protocol and the other one being an authentication protocol …."); Appx4587 (89:19–20, 91:17–92:1) (inventor confirming he "came up with … methods of secure authenticated distance measurements" by "combin[ing] authentication in the distance measurement").

The patents' prosecution histories further establish unconventionality. The prosecution histories cite and discuss a prior art cryptography protocol for content protection called High-bandwidth Digital Content Protection version 1.0 ("HDCP 1.0"). Appx36. HDCP 1.0 was designed by major companies, including Intel, shortly before the patents' priority date. Appx1932–33 (¶¶99–100); Appx2161–219; Appx2220–73. HDCP 1.0 was state-of-the-art as of its release and did **not** include the claimed invention here—a transmitter that: (1) determines a receiver's compliance with a set of compliance rules using a certificate, (2) provides a first signal to the receiver and determines whether the receiver's responsive second signal is derived from a cryptographic "shared secret," and (3) performs a distance measurement based on first signal and the authenticated second signal using a "predetermined time." *Id*. It was not until the introduction of HDCP 2 approximately six years **after** the patents' priority date that the industry included these patented improvements in the communication protocol. Appx3650; Appx4537 (¶99), Appx4540 (¶648).

Prior publications on cryptography show that skilled artisans would not have found it obvious—much less "conventional"—to modify or combine prior cryptographic protocols to arrive at the claimed invention. Appx4528–30 (¶¶75–78), Appx4538–39 (¶560); Appx4140 ("The apparent simplicity of the techniques presented … is misleading. The design of such techniques is intricate and the

security is brittle; those presented have been carefully selected."); Appx4132 ("It is very difficult to maintain a protocol's security if most of the parties involved are active cheaters."); Appx4134 ("You can't make systems secure by tacking on cryptography as an afterthought. You have to know what you are doing every step of the way ….").

Indeed, the prior art cryptography protocols for content protection, including Digital Transmission Content Protection version 1.2 ("DTCP 1.2"), were designed by "[t]eams of expert engineers at major companies" including Intel shortly before the patents' priority date. Appx4524–27(¶¶66–70), Appx4540(¶648). Those were state of the art cryptography protocols as of their release. But they did *not* include the claimed invention, demonstrating that skilled artisans would not have been motivated as of the priority date to divine the patents' teachings "even before the proverbial ink had time to dry on [DTCP 1.2's] pages." Appx4527(¶71).

In *CosmoKey* this Court found that, "[r]ead in context, the [record] makes clear that the claimed steps were developed by the inventors, are not admitted prior art, and yield certain advantages over the described prior art." 15 F.4th at 1099. Likewise, the record here makes clear that the patentee developed the specific combination of certificate-based authentication with an authenticated proximity determination, that these elements were not conventional, and that they provided a

technical improvement over previous, conventional distance-bounding protocols. The claims demonstrate an inventive concept; they are hardly a mere "abstract idea."

## B. The District Court's Unsupported Step Two Analysis Cannot Be Sustained

The district court held that the claims "do[] not contain additional limitations, whether considered individually or as an ordered combination, that 'transform' the claimed abstract idea [of authenticated content transfer] into patent-eligible subject matter." Appx17. In doing so, the district court essentially repeated its conclusions from step one, consistent with its view that "the distinction between the first and second steps of the *Alice* analysis is porous to the extent that it is decipherable." Appx14 n.1. The court's step two analysis cannot be sustained.

The court's analysis makes factual findings that are unsupported by—and indeed contrary to—the specification and other evidence. In particular, the court dismissed each claim element, and their ordered combination, that MCP identified as providing inventive concepts. In doing so, it failed to view the facts in the light most favorable to the nonmoving party and failed to draw all inferences in that party's favor, contrary to the summary judgment standard. *See Centrak*, 915 F.3d at 1365; *Gonzalez*, 978 F.3d at 257; Fed. R. Civ. P. 56(a). The court incorrectly found that MCP "does not point to anything in the #809 patent that discloses how to use a certificate to determine whether a receiver is compliant with compliance rules (*i.e.*, to authenticate) or how to use a signal modified by a shared secret to determine

proximity." Appx16–17; *see also* Appx17 (finding that "the patent[s] do[] not disclose a 'specific type' of either authentication or authenticated proximity determination").

That ruling falls short many times over. First, whether the patents sufficiently describe "how to" implement these claim elements is a question of written description and enablement under § 112, not abstraction under § 101. Second, the rulings are unsupported by, and contrary, to the claims, the specification, and other evidence of record. The district court offered no reason for rejecting the specification's explanation that the invention improved upon the prior art *Brands-Chaum* computer, Appx28 (2:26–37), which the court was not permitted to ignore at the summary judgment stage. *Berkheimer*, 881 F.3d at 1368–70. Nor did the court address any of the other record evidence showing that at least (1) the certificate-based authentication of claim elements 1[c]–[e] and (2) the proximity determination using the round-trip time of signals modified by a shared secret of claim elements 1[e]–[i], were not conventional and provide specific technical implementations that contain an inventive concept. *See supra* pp.8–15, § II.A.3.

Third, the district court did not address the ordered combination of these elements other than to conclude that "adding two abstract ideas together does not create a non-abstract combination." Appx17 (citing *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017)). The court's reasoning ignores the

requirement that the claim elements must be considered "both individually and as an ordered combination" at step two. *Alice*, 572 U.S. at 217. Here, moreover, the claims do not merely recite a pair of abstract ideas—authentication and distance bounding. It recites a specific method of authentication, a specific technique for distance bounding, and combines them in a particular way—including the use of a shared-secret for authentication in a particular way as part of the distance-bounding measurement—that is anything but conventional. Nothing the district court said suggests otherwise. Simply caricaturing the claims as combining two abstract ideas, without examining the specific way the particular mechanisms are combined, disregards rather than examines the ordered combination.

The district court similarly erred in dismissing this Court's and the PTAB's determination that the asserted claims are nonobvious—over prior art that included the *Brands-Chaum* computer—as "irrelevant." Appx17–18. These decisions confirm that there is at least a factual dispute regarding whether the elements of the asserted claims and their ordered combination provide inventive concepts. The district court did not attempt to explain how, as a matter of logic, the claims could be nonobvious technological improvements over specific prior art and yet could still be merely conventional and lacking an inventive concept. On a motion for summary judgment, these decisions and other evidence of record discussed above must be viewed in the light most favorable to MCP. They at the very least support a

reasonable inference that the asserted claims provide an inventive concept at step two of the *Alice* analysis.

At a minimum, there was a genuine and material factual dispute on whether "the individual claim limitations" or "the ordered combination of limitations" constitutes an "inventive concept." *BASCOM*, 827 F.3d at 1349. Summary judgment at *Alice* step two is inappropriate where, as here, there "is at least a genuine issue of material fact in light of the specification [and other evidence] regarding whether the [asserted claims] … perform well-understood, routine, and conventional activities." *Berkheimer*, 881 F.3d 1370.

**CONCLUSION**

For the foregoing reasons, the district court's judgment should be reversed.

Respectfully submitted,

Dated: February 9, 2026

/s/ Peter F. Snell

Peter F. Snell
MINTZ, LEVIN, COHN, FERRIS,
    GLOVSKY & POPEO, P.C.
919 Third Avenue
New York, NY 10022
(212) 935-3000
PFSnell@mintz.com

Michael T. Renaud
William A. Meunier
Timothy J. Rousseau
MINTZ, LEVIN, COHN, FERRIS,
    GLOVSKY & POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000
MTRenaud@mintz.com
WAMeunier@mintz.com
TJRousseau@mintz.com

*Counsel for Appellant*
*Media Content Protection LLC*

# ADDENDUM

## TABLE OF CONTENTS

| Description | Page |
|---|---|
| Memorandum Opinion [Regarding Intel's Motion for Summary Judgment], Case No. 20-1243, Dkt. 281 (D. Del. Nov. 25, 2025) | Appx1 |
| Order [Granting Intel's Motion for Summary Judgment], Case No. 20-1243, Dkt. 282 (D. Del. Nov. 25, 2025) | Appx20 |
| Final Judgment, Case No. 20-1243, Dkt. 284 (D. Del. Dec. 4, 2025) | Appx21 |
| U.S. Patent No. 9,436,809 | Appx23 |
| U.S. Patent No. 10,091,186 | Appx34 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MEDIA CONTENT
PROTECTION LLC,

Plaintiff,

v.

INTEL CORP.,

Defendant.

Civil Action No. 20-1243-CFC

---

Brian E. Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, Delaware;
Michael T. Renaud, Adam S. Rizk, Michael J. McNamara, Marguerite McConihe,
William A. Meunier, Catherine C. Xu, Timothy J. Rousseau, Courtney Herndon,
William S. Dixon, Tianyi Tan, Gabriella J. Flick, and Sean M. Casey, MINTZ,
LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C., Boston, Massachusetts;
Peter F. Snell, Brad M. Scheller, and Hannah M. Edge, MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY & POPEO, P.C., New York, New York; Adam R. Banes,
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C., Washington,
District of Columbia; Nana Liu, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY &
POPEO, P.C., San Francisco, California; Tawfik A. Goma, MINTZ, LEVIN,
COHN, FERRIS, GLOVSKY & POPEO, P.C., Miami, Florida,

*Counsel for Plaintiff*

Jennifer Ying and Cameron P. Clark, MORRIS, NICHOLS, ARSHT &
TUNNELL LLP, Wilmington, Delaware; Chad S. Campbell, PERKINS COIE
LLP, Phoenix, Arizona; Christina J. McCullough, Antoine McNamara, and
Theresa H. Nguyen, PERKINS COIE LLP, Seattle, Washington; Sarah E.
Piepmeier, PERKINS COIE LLP, San Francisco, California

*Counsel for Defendant*

# MEMORANDUM OPINION

November 25, 2025
Wilmington, Delaware

COLM F. CONNOLLY
CHIEF JUDGE

Plaintiff Media Content Protection LLC (Media Content) has sued Intel Corp. for infringement of U.S. Patents Nos. 9,436,809 (the #809 patent) and 10,091,186 (the #186 patent). D.I. 92. Pending before me is Intel's Motion for Summary Judgment #1. D.I. 228. Intel argues that it is entitled to summary judgment in its favor because the asserted patents are invalid under 35 U.S.C. § 101 for failing to claim patentable subject matter.

## I.    BACKGROUND

The asserted patents are each titled "Secure Authenticated Distance Measurement" and share the same written description. D.I. 230 ¶ 6; D.I. 248 ¶ 6. The parties agree that claim 1 of the #809 patent is representative of the asserted claims of both patents. D.I. 229 at 17; D.I. 247 at v n.‡. That claim reads:

> A first device for controlling delivery of protected content to a second device, the first device comprising:
>
> a memory;
>
> a processor, said processor arranged to:
>
>> receive a certificate of the second device, the certificate providing information regarding the second device;

determine whether the second device is compliant
with a set of compliance rules utilizing said
information provided in said certificate;

provide a first signal to the second device
depending when the second device is determined
to be compliant with the set of compliance rules;

receive a second signal from the second device
after providing the first signal;

determine whether the second signal is derived
from a secret known by the first device;

determine whether a time difference between
providing the first signal and receiving the second
signal is less than a predetermined time; and

allow the protected content to be provided to the
second device when at least the second signal is
determined to be derived from the secret and the
time difference is less than the predetermined
time.

#809 patent at claim 1.

## II.   LEGAL STANDARDS

### A.   Motion for Summary Judgment

A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material facts and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "could affect the

outcome of the proceeding." *Roth v. Norfalco LLC*, 651 F.3d 367, 373 (3d Cir.

2011) (internal quotation marks and citation omitted). "All justifiable inferences

are to be drawn in the nonmovant's favor but the mere existence of some evidence

in support of the nonmovant is insufficient to dent a motion for summary judgment." *Wharton v. Danberg*, 854 F.3d 234, 241 (3d Cir. 2017) (internal quotation marks and citation omitted). "[E]nough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." *Id.* (internal quotation marks and citation omitted).

**B.    Patent-Eligible Subject Matter**

Section 101 of the Patent Act defines patent-eligible subject matter: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.

There are three judicially created limitations on the literal words of § 101. The Supreme Court has long held that laws of nature, natural phenomena, and abstract ideas are not patentable subject matter. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). These exceptions to patentable subject matter arise from the concern that the "[m]onopolization" of "the[se] basic tools of scientific and technological work" "might tend to impede innovation more than it would tend to promote it." *Id.* (internal quotation marks and citations omitted). Abstract ideas include mathematical formulas and calculations. *Gottschalk v. Benson*, 409 U.S. 63, 71–72 (1972).

3

"[A]n invention is not rendered ineligible for patent [protection] simply because it involves an abstract concept." *Alice*, 573 U.S. at 217. "Applications of such concepts to a new and useful end . . . remain eligible for patent protection." *Id.* (internal quotation marks, alterations, and citations omitted). But "to transform an unpatentable law of nature [or abstract idea] into a patent-eligible application of such a law [or abstract idea], one must do more than simply state the law of nature [or abstract idea] while adding the words 'apply it.'" *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72 (2012) (emphasis removed).

In *Alice*, the Supreme Court made clear that the framework laid out in *Mayo* for determining if a patent claims eligible subject matter involves two steps. The court must first determine whether the patent's claims are directed to a patent-ineligible concept—i.e., are the claims directed to a law of nature, natural phenomenon, or abstract idea? *Alice*, 573 U.S. at 217. If the answer to this question is no, then the patent is not invalid for teaching ineligible subject matter. If the answer to this question is yes, then the court must proceed to step two, where it considers "the elements of each claim both individually and as an ordered combination" to determine if there is an "inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217–18 (alteration in original) (internal quotations and citations omitted).

4

The two steps are "plainly related" and "involve overlapping scrutiny of the content of the claims." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

Issued patents are presumed to be valid, but this presumption is rebuttable. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 96 (2011). Subject-matter eligibility is a matter of law, but the party challenging a patent's validity must show underlying facts by clear and convincing evidence. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

## III. DISCUSSION

I agree with Intel that the asserted claims of the #809 and #186 patents are invalid under § 101 because they are directed to the abstract idea of an authenticated content transfer and do not contain an inventive concept that transforms this abstract idea into a patent-eligible application.

### A. *Alice* Step One—Whether the Claims are Directed to Patent-Ineligible Subject Matter

Claim 1 of the #809 patent claims a "first device for controlling delivery of protected content to a second device." The first device is comprised of "a memory" and "a processor." The processor is arranged to work as follows: First, it receives a "certificate of [a] second device." That certificate "provid[es] information regarding the second device" that the processor "utilize[es]" to "determine whether the second device is compliant with a set of compliance rules."

5

If the processor determines that the second device is compliant with the rules, it "provide[s] a first signal to the second device," and "after providing th[at] first signal," it "receive[s] a second signal from the second device." The processor then "determines[s]" (1) "whether the second signal is derived from a secret known by the first device," and (2) "whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time." Finally, if the processor determines that the second signal is derived from the secret and the time difference is less than the predetermined time, it "allow[s] the protected content to be provided to the second device."

Thus, claim 1 claims nothing more than a device that is capable of participating in a process for authenticated content transfer. Authentication, i.e., "[c]ontrolling access to resources," is an abstract idea that "is pervasive in human activity, whether in libraries (loaning materials only to card-holding members), office buildings (allowing certain employees entrance to only certain floors), or banks (offering or denying loans to applicants based on suitability and intended use)." *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020). Content transfer, even if based on meeting a condition, is similarly an abstract idea and not an improvement to computer functionality. *See Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 703 (Fed. Cir. 2023) ("[P]roviding information . . . based on meeting a condition," specifically, the

6

"user's location," is an abstract idea); *Intell. Ventures I LLC v. Cap. One Bank*, 792 F.3d 1363, 1369–70 (Fed. Cir. 2015) ("[C]ustomizing [and providing] information based on (1) information known about the user and (2) navigation data" is an abstract idea). Claim 1, then, is directed to the patent-ineligible concept of an abstract idea.

Media Content insists that the asserted claims "are directed to a specific technical improvement to then-existing computer systems, and are therefore not directed to an unpatentable abstract idea." D.I. 247 at 9–10. But it does not identify in the claims or anywhere else in the asserted patents' specifications a specific solution to a technological problem. This failure is understandable, as the patents' shared written description discloses no specific means or method that improves the relevant technology, but instead, like the asserted claims, is "directed to a result or effect that itself is the abstract idea and merely invoke[s] generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). Neither the asserted claims nor the patents' written description recite any specialized components or protocols for performing authentication or content transfer, and nowhere in the specifications do the patents disclose an improvement to computer technology.

Media Content argues that "[t]he Patents' improvements to the *Brands-Chaum* computer are embodied by the claimed transmitter [i.e., the first device],

7

which must be configured to use a receiver's certificate to determine the receiver's compliance with compliance rules and then determine the physical proximity of the receiver using the RTT [i.e., round trip time] of signals, where the RTT is authenticated by using a shared secret." D.I. 247 at 4. (The parties agree that the *Brands-Chaum* computer "exemplified" "distance-bounding protocols," D.I. 248 ¶ 34; D.I. 266 ¶ 34, and that "[t]o achieve distance confirmation," the *Brands-Chaum* computer "use[d] . . . a large number of rapid single-bit exchanges," D.I. 248 ¶ 35; D.I. 266 ¶ 35.) But Media Content does not explain how the asserted claims technologically improved the transmitter or the *Brands-Chaum* device. And, more importantly, it does not identify where in the claims or written description a specific technological improvement of the transmitter or *Brands-Chaum* device is disclosed. And again, that failure makes sense, as the patents' shared written description itself makes clear that at the time the applications for the patents were filed, "[t]echnology to perform device authentication and encrypted transfer [wa]s available and [wa]s called a secure authenticated channel (SAC)." #809 patent at 2:8–10. To the limited extent that the patents describe the claimed device and its operation, the various embodiments incorporate well-known methods, conventional computer components, and ISO standards. *See, e.g.*, #809 patent at 3:15–16 ("In a specific embodiment the first signal is a spread spectrum signal."); 3:30–35 ("In a specific embodiment the first signal and the common

secret are bit words and the second signal comprises information being generated by performing an exclusive OR operation (XOR) between the bit words. Thereby, it is a very simple operation . . . resulting in demand for few resources . . . ."); 3:52–55 ("The secret could be shared using e.g. key transport mechanisms as described in ISO 11770-3. Alternatively, a key agreement protocol could be used, which e.g. is also described in ISO 11770-3."); 5:48–62 ("The signal used for the distance measurement may be a normal data bit signal, but also special signals other than for data communication may be used . . . . The authentication . . . and the exchange of secret . . . could be performed using the protocols described in some known ISO standards e.g. ISO 9798 and ISO 11770.").

In my view, claim 1 of the #809 patent is in all material respects analogous to the claim for an electronic device found to be ineligible for patentability under § 101 by the Federal Circuit in *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342 (Fed. Cir. 2021). The claim at issue in *Universal Secure Registry* was "directed to an electronic ID device that includes a biometric sensor, user interface, communication interface, and processor working together to (1) authenticate the user based on two factors—biometric information and secret information known to the user—and (2) generate encrypted authentication information to send to the secure registry through a point-of-sale device." *Id.* at 1352. The court found telling that "[t]here [wa]s no description in the patent

9

of a specific technical solution by which the biometric information or the secret information is generated, or by which the authentication information is generated and transmitted," and the court held that the patent's claims "recite[d] conventional actions in a generic way—e.g., authenticating a user using conventional tools and generating and transmitting that authentication—without improving any underlying technology." *Id.* (alteration, quotation marks, and citation omitted). In this case, the #809 patent similarly provides no description of a specific technical solution by which the first device is arranged to transmit protected information to the second device. Accordingly, the claims are directed to an abstract idea under *Alice* step one.

Claim 1 is also analogous to the method claims found to be invalid under § 101 by the Federal Circuit in *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014 (Fed. Cir. 2017). The claims at issue in *Prism* taught "an abstract process" that included: "(1) receiving identity data from a device with a request for access to resources; (2) confirming the authenticity of the identity data associated with that device; (3) determining whether the device identified is authorized to access the resources requested; and (4) if authorized, permitting access to the requested resources." *Id.* at 1017. The Federal Circuit held that the claimed methods were "abstract," not "concrete" or "specific," and were invalid because

10

they were directed to the abstract idea of "providing restricted access to resources."
*Id.*

The Federal Circuit cases relied upon by Media Content in its briefing are, with one exception, not applicable here because the patents at issue in those cases offered specific technical improvements to computer security or other computer functions. *See Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1146 (Fed. Cir. 2019) (finding claims eligible because they were directed to "varying the way check data is generated by varying the permutation applied to different data blocks"); *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348–49 (Fed. Cir. 2018) (finding claim eligible because it was directed to storing a license record in a "particular, modifiable, non-volatile portion of [a] computer's BIOS . . . for verification by interacting with the distinct computer memory that contains the program to be verified"); *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1295 (Fed. Cir. 2020) (finding claim eligible that went "beyond what is required simply by the claim term 'multi-level . . . security'" by claiming an "object-oriented key manager," and the use of a "label" as well as encryption for access management (alteration in original)); *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1307 (Fed. Cir. 2020) (finding claims eligible that were directed to reducing the "latency experienced by parked secondary stations in communication systems" by adding "an additional data field for polling"). The improvements to

11

computer functioning claimed in these cases demonstrated "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving" that result. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018).

The one exception is *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091 (Fed. Cir. 2021).[1] In *CosmoKey*, as in *Universal Secure Registry* and *Prism*, the challenged claims were directed to technology configured to verify a user's identity to permit access to a transaction. *See CosmoKey*, 15 F.4th at 1093–94. The Federal Circuit distinguished *CosmoKey* from *Universal Secure Registry* on the basis that the asserted claims in *Universal Secure Registry* "were directed to the abstract idea of combining multiple conventional authentication techniques,"

---

[1] The Federal Circuit decided *CosmoKey* at the second step of *Alice*, but the distinction between the first and second steps of the *Alice* analysis is porous to the extent that it is decipherable. "[T]here is considerable overlap between step one and step two, and in some situations this analysis could be accomplished without going beyond step one." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016); *see CosmoKey*, 15 F.4th at 1101 (Reyna, J., concurring) ("I agree with my colleagues that '[t]he '903 Patent claims and specification recite a specific improvement to authentication that increases security, prevents unauthorized access by a third party, is easily implemented, and can advantageously be carried out with mobile devices of low complexity.' . . . But this is a step-one rationale."); *see also Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1382 n.2 (Fed. Cir. 2017) (Linn, J., dissenting in part and concurring in part) (expressing "serious[] doubt" that "the boundary between steps one and two can somehow be defined").

12

and that the increased security was "no greater than the sum of the security provided by each technique alone." *Id.* at 1096. The court held that the relevant patent in *CosmoKey,* by contrast, "depart[ed] from earlier approaches" in a way that was not simply cumulative. *Id.* I have read *Universal Secure Registry* and *CosmoKey* numerous times, but I confess that I am unable to understand how either the problem or the solution described in *CosmoKey* is more "specific" or "technological" than those described in *Universal Secure Registry.* But to the extent that the relevant case law draws a line between generic and specific authorization processes, the #809 patent is more like the patents asserted in *Universal Secure Registry* and *Prism* than it is like that in *CosmoKey.* The #809 patent covers the abstract idea of combining multiple generic steps—a signal, a certificate, and a time measurement—for authentication, without "speak[ing] to specific or technical problems and solutions." *In re AuthWallet, LLC*, 2023 WL 3330298, at *4 (Fed. Cir. May 10, 2023).

In sum, because neither claim 1 nor anything else in the #809 patent's specification explains how the claimed device is configured to achieve the claimed authenticated content transfer and because claim 1 relies instead on generic components (i.e., a transmitter with memory and a processor) behaving conventionally, the claim is directed to the abstract idea of authenticated content transfer.

13

### B. *Alice* Step Two—Whether the Claims Contain an Additional Inventive Concept

The #809 patent does not contain additional limitations, whether considered individually or as an ordered combination, that "transform" the claimed abstract idea into patent-eligible subject matter. *Mayo*, 566 U.S. at 72. The claimed device therefore fails step two. *See Alice*, 573 U.S. at 222–23, 225 (considering at step two "[t]he introduction of a computer into the claims" and holding that the use of "a generic computer to perform generic computer functions" does not provide the requisite inventive concept to satisfy step two); *Prism Techs.*, 696 F. App'x at 1017–18 (holding that, "[v]iewed as an ordered combination, the asserted claims recite[d] no more than the sort of perfectly conventional generic computer components employed in a customary manner" that did "not rise to the level of an inventive concept" and therefore did not "transform the abstract idea into a patent-eligible invention" under *Alice* step two (quotation marks and citation omitted)).

Media Content argues that the asserted claims' "certificate-based authentication" and "proximity determination using the RTT of signals modified by a shared secret" elements individually and as an ordered combination "were not conventional and demonstrate that the claims contain an inventive concept." D.I. 247 at 17. But it does not point to anything in the #809 patent that discloses how to use a certificate to determine whether a receiver is compliant with compliance rules (i.e., to authenticate) or how to use a signal modified by a shared

14

secret to determine proximity. Media Content insists that device claimed in claim 1 "perform[s] a specific type of authentication—using a certificate from the receiver to determine compliance with compliance rules . . . —and then a specific type of authenticated proximity determination—determining that an RTT is less than a time selected to ensure that the devices are physically proximate where the RTT is authenticated by modifying a signal using a shared secret that enables the transmitter to confirm that it is determining the proximity of the receiver and not some other (unauthorized) device." D.I. 247 at 10–11. But it never identifies in its briefing, and the patent does not disclose, a "specific type" of either authentication or authenticated proximity determination, and adding two abstract ideas together does not create a non-abstract combination. *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017).

Finally, citing *Intel Corp. v. Koninklijke Philips N.V.*, 2024 WL 725243 (Fed. Cir. Feb. 22, 2024), Media Content argues that "the Federal Circuit and [Patent Trial And Appeal Board (PTAB)] already determined [that] the claims [of the #809 patent] are an improvement on the then-existing '*Brands-Chaum*' computer that was the basis for Intel's earlier failed validity challenge," D.I. 247 at 2, and that "for at least the reasons already identified by the Federal Circuit and PTAB, a jury could reasonably find that Intel has failed to meet its burden of proving by clear and convincing evidence that the Patents' claims are directed to

15

conventional combinations of conventional elements, and summary judgment is therefore inappropriate," D.I. 247 at 1 (emphasis removed). But the validity challenge before the Federal Circuit and PTAB in *Intel* was for obviousness, 2024 WL 725243, at *1, and the findings the Federal Circuit and PTAB made with respect to novelty and nonobviousness in that case are irrelevant to the question of patent eligibility, *Diamond v. Diehr*, 450 U.S. 175, 188–89 (1981) ("The 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter."); *Rsch. Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010) ("[T]he Supreme Court advised that section 101 eligibility should not become a substitute for patentability analysis related to prior art, adequate disclosure, or other conditions and requirements of Title 35."). Even if claim 1 is not invalid for obviousness, it lacks an inventive concept that removes it from the realm of abstract ideas and therefore it is invalid under § 101. *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1152 (Fed. Cir. 2016).

## IV. CONCLUSION

For the reasons discussed above, the #809 and #186 patents are directed toward an unpatentable abstract idea and lack an inventive concept that would

make their subject matter eligible for patentability. Accordingly, they are invalid under § 101 and I will grant Intel's Motion for Summary Judgment #1 (D.I. 228).

The Court will enter an Order consistent with this Memorandum Opinion.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| MEDIA CONTENT PROTECTION LLC, | |
|---|---|
| Plaintiff, | |
| v. | Civil Action No. 20-1243-CFC |
| INTEL CORP., | |
| Defendant. | |

## **ORDER**

At Wilmington on this Twenty-fifth day of November in 2025, for the
reasons set forth in the Memorandum Opinion issued on this day, it is HEREBY
ORDERED that Intel Corp.'s Motion for Summary Judgment of Invalidity Based
on 35 U.S.C. § 101 (MSJ No. 1) (D.I. 228) is GRANTED.

_____
CHIEF JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MEDIA CONTENT PROTECTION LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | C.A. No. 20-1243 (CFC) |
| v. | ) ) | |
| INTEL CORP., | ) ) | |
| Defendant. | ) | |

## ~~[PROPOSED]~~ FINAL JUDGMENT

WHEREAS, original plaintiffs Koninklijke Philips N.V. and Philips North America LLC (collectively, "Philips") filed this action against defendant Intel Corporation ("Intel") asserting infringement of U.S. Patent No. 9,436,809 ("the '809 Patent") and U.S. Patent No. 10,091,186 "the '186 Patent") (collectively, the "Asserted Patents") on September 17, 2020 (D.I. 1);

WHEREAS, the parties stipulated to substitute Media Content Protection LLC ("MCP") for Philips as plaintiff on August 9, 2024 (D.I. 75, 78);

WHEREAS, on November 25, 2025, the Court granted Intel's motion for summary judgment of invalidity of all asserted claims of the '186 and '809 patents based on 35 U.S.C. § 101 (D.I. 281, 282);

NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED THAT:

1.  Final judgment is entered in favor of Intel and against MCP on MCP's Counts I and II (*see* D.I. 92 at 14-20);

2.  Final judgment is entered in favor of Intel and against MCP on Intel's Counterclaim Counts I and II (*see* D.I. 98 at 41-44);

3.  Any and all of Intel's remaining defenses and counterclaims are dismissed without prejudice; and

4.  Any assessment of costs, including under Federal Rule of Civil Procedure 54(d) and Local Rule 54.1, or motion seeking attorneys' fees, including under Federal Rule of Civil Procedure 54(d) and Local Rule 54.3, shall be deferred until 30 days after the mandate or other decision has issued resolving the last appeal relating to this litigation. If MCP does not file an appeal in this litigation, Intel's deadline for filing such motions and its bills of costs shall be extended to 30 days after the deadline for MCP to file an appeal has lapsed.

SO ORDERED this 4th day of December, 2025.

_____
CHIEF, UNITED STATES DISTRICT JUDGE

2



US009436809B2

(12) **United States Patent**     (10) **Patent No.:**   **US 9,436,809 B2**

Kamperman     (45) **Date of Patent:**   *Sep. 6, 2016

(54) **SECURE AUTHENTICATED DISTANCE MEASUREMENT**

(71) Applicant: **KONINKLIJKE PHILIPS N.V.,** Eindhoven (NL)

(72) Inventor: **Franciscus Lucas Antonius Johannes Kamperman**, Geldrop (NL)

(73) Assignee: **KONINKLIJKE PHILIPS N.V.,** Eindhoven (NL)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/538,493**

(22) Filed: **Nov. 11, 2014**

(65) **Prior Publication Data**

US 2015/0074822 A1    Mar. 12, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 10/521,858, filed as application No. PCT/IB03/02932 on Jun. 27, 2003, now Pat. No. 8,886,939.

(30) **Foreign Application Priority Data**

Jul. 26, 2002    (EP) .................................... 02078076

(51) **Int. Cl.**
   *G06F 21/10*      (2013.01)
   *H04L 29/06*     (2006.01)
     (Continued)

(52) **U.S. Cl.**
   CPC ............. *G06F 21/10* (2013.01); *H04L 63/107* (2013.01); *G06F 2221/07* (2013.01); *G06F*

*2221/2111* (2013.01); *H04L 2463/101* (2013.01); *H04W 12/06* (2013.01); *H04W 24/00* (2013.01)

(58) **Field of Classification Search**
   CPC .............................. G06F 21/10; H04L 63/107
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,438,824 A    3/1984   Mueller-Schloer
4,688,036 A    8/1987   Hirano et al.
(Continued)

FOREIGN PATENT DOCUMENTS

JP    9170364 A     0/6199
JP    H04306760 A   10/1992
(Continued)

OTHER PUBLICATIONS

Stefan Brands and Devid Chaum, "Distance-Bounding Protocols", Eurocrypt '93 (1993), pp. 344-359.
(Continued)

*Primary Examiner* — Darren B Schwartz

(57)       **ABSTRACT**

The invention relates to a method for a first communication device to perform authenticated distance measurement between the first communication device and a second communication device, wherein the first and the second communication device share a common secret and the common secret is used for performing the distance measurement between the first and the second communication device. The invention also relates to a method of determining whether data stored on a first communication device are to be accessed by a second communication device. Moreover, the invention relates to a communication device for performing authenticated distance measurement to a second communication device. The invention also relates to an apparatus for playing back multimedia content comprising a communication device.

60 Claims, 3 Drawing Sheets



(51) **Int. Cl.**
    *H04W 12/06*          (2009.01)
    *H04W 24/00*          (2009.01)

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,126,746 A | 6/1992 | Gritton | |
| 5,596,641 A | 1/1997 | Ohashi et al. | |
| 5,602,917 A | 2/1997 | Mueller | |
| 5,659,617 A * | 8/1997 | Fischer | H04L 9/3271 |
| | | | 380/258 |
| 5,723,911 A | 3/1998 | Glehr | |
| 5,778,071 A | 7/1998 | Caputo et al. | |
| 5,937,065 A | 8/1999 | Simon et al. | |
| 5,949,877 A | 9/1999 | Traw et al. | |
| 5,983,347 A | 11/1999 | Brinkmeyer et al. | |
| 6,085,320 A | 7/2000 | Kaliski, Jr. | |
| 6,088,450 A | 7/2000 | Davis et al. | |
| 6,151,676 A | 11/2000 | Cuccia et al. | |
| 6,208,239 B1 | 3/2001 | Muller et al. | |
| 6,346,878 B1 | 2/2002 | Pohlman et al. | |
| 6,351,235 B1 | 2/2002 | Stilp | |
| 6,442,690 B1 * | 8/2002 | Howard, Jr. | G06F 21/602 |
| | | | 713/156 |
| 6,484,948 B1 | 11/2002 | Sonoda | |
| 6,493,825 B1 | 12/2002 | Blumenau et al. | |
| 6,526,509 B1 * | 2/2003 | Horn | H04L 9/3263 |
| | | | 380/277 |
| 6,550,011 B1 * | 4/2003 | Sims, III | G06F 21/10 |
| | | | 365/52 |
| 7,200,233 B1 | 4/2007 | Keller et al. | |
| 8,107,627 B2 | 1/2012 | Epstein | |
| 8,352,582 B2 | 1/2013 | Epstein | |
| 8,997,243 B2 | 3/2015 | Epstein | |
| 2001/0008558 A1 | 7/2001 | Hirafuji | |
| 2001/0043702 A1 | 11/2001 | Elteto et al. | |
| 2001/0044786 A1 | 11/2001 | Ishibashi | |
| 2001/0050990 A1 * | 12/2001 | Sudia | G06Q 20/02 |
| | | | 380/284 |
| 2002/0007452 A1 | 1/2002 | Traw et al. | |
| 2002/0026424 A1 | 2/2002 | Akashi | |
| 2002/0026576 A1 | 2/2002 | Das-Purkayastha et al. | |
| 2002/0035690 A1 | 3/2002 | Nakano | |
| 2002/0061748 A1 | 5/2002 | Nakakita et al. | |
| 2002/0078227 A1 | 6/2002 | Kronenberg | |
| 2002/0166047 A1 * | 11/2002 | Kawamoto | H04L 9/3263 |
| | | | 713/169 |
| 2003/0021418 A1 | 1/2003 | Arakawa et al. | |
| 2003/0030542 A1 | 2/2003 | von Hoffmann | |

| | | | |
|---|---|---|---|
| 2003/0051151 A1 * | 3/2003 | Asano | G11B 20/00086 |
| | | | 713/193 |
| 2003/0065918 A1 | 4/2003 | Willey | |
| 2003/0070092 A1 | 4/2003 | Hawkes et al. | |
| 2003/0112978 A1 | 6/2003 | Rodman et al. | |
| 2003/0184431 A1 | 10/2003 | Lundkvist | |
| 2003/0220765 A1 | 11/2003 | Overy et al. | |
| 2004/0015693 A1 | 1/2004 | Kitazumi | |
| 2004/0080426 A1 * | 4/2004 | Fraenkel | H04W 8/245 |
| | | | 340/9.14 |
| 2005/0114647 A1 | 5/2005 | Epstein | |
| 2005/0265503 A1 | 12/2005 | Rofheart et al. | |
| 2006/0294362 A1 | 12/2006 | Epstein | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | H0619948 A | 1/1994 |
| JP | H08234658 A | 9/1996 |
| JP | H09170364 A | 6/1997 |
| JP | 11101035 A | 4/1999 |
| JP | 11208419 A | 8/1999 |
| JP | 2000357156 A | 12/2000 |
| JP | 2001249899 A | 9/2001 |
| JP | 2001257672 A | 9/2001 |
| JP | 2002124960 A | 4/2002 |
| JP | 2002189966 A | 7/2002 |
| WO | 9739553 A1 | 10/1997 |
| WO | 9949378 | 9/1999 |
| WO | 0152234 A1 | 7/2001 |
| WO | 0193434 A2 | 12/2001 |
| WO | 0233887 A2 | 4/2002 |
| WO | 0235036 A1 | 5/2002 |

OTHER PUBLICATIONS

Tim Kindber & Kan Zhang, "Context Authentication Using Constrained Channels", pp. 1-8.
Hitachi, Ltd. "5C Digital Transmission Content Protection White Papter", Rev. 1.0, July 14, 1998, pp. 1013.
Boyd et al, "Protocols for Authentication and Key Establishment", Spring-Verlag, September 17, 2003, pp. 116-120, 195-195, 305.
Modern Cryptography Theory (1986) Chapter 9, ISBN: 4-88552-064-9 (Japanese).
Hayashi et al, Encyption and Authentication Program Module, Technical Paper (Japanese) NTT R&D vol. 44 No. 10 Oct. 1, 1995.
Ikeno et al. "Modern Cryptography Theory" Japan, Institute of Electronics, Information and Communication Engineersm Nov. 15, 1997, p. 175-177.

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4

# SECURE AUTHENTICATED DISTANCE MEASUREMENT

This application claims, pursuant to 35 USC 120, priority to and the benefit of the earlier filing date of, that patent application entitled "Secure Authenticated Distance Measurement", filed on Jan. 21, 2005 and afforded Ser. No. 10/521,858 (now U.S. Pat. No. 8,886,939), which claimed priority to and the benefit of the earlier filing date, as a National Stage Filing of that international patent application filed on Jun. 27, 2003 and afforded serial number PCT/IB03/02932 (WO2004014037), which claimed priority to and the benefit of the earlier filing date of that patent application filed on Jul. 26, 2002 and afforded serial number EP02078076.3, the contents of all of which are incorporated by reference, herein.

This application is further related to that patent application entitled "Secure authenticated Distance Measurement", filed on Jul. 24, 2009 and afforded Ser. No. 12/508,917 (now U.S. Pat. No. 8,543,819), issued Sep. 24, 2013), which claimed priority to and the benefit of the earlier filing date of that patent application entitled "Secure Authenticated Distance Measurement", filed on Jan. 21, 2005 and afforded Ser. No. 10/521,858 (now U.S. Pat. No. 8,886,939), the contents of which are incorporated by reference herein.

The invention relates to a method for a first communication device to perform authenticated distance measurement between a first communication device and a second communication device. The invention also relates to a method of determining whether data stored on a first communication device is to be accessed by a second communication device. Moreover, the invention relates to a communication device for performing authenticated distance measurement to a second communication device. The invention also relates to an apparatus for playing back multimedia content comprising a communication device.

Digital media have become popular carriers for various types of data information. Computer software and audio information, for instance, are widely available on optical compact disks (CDs) and recently also on digital video/versatile discs (DVDs) which have been gaining in distribution share. The CD and the DVD utilize a common standard for the digital recording of data, software, images, audio and multimedia. Additional media, such as recordable discs, solid-state memory, and the like, are making considerable gains in the software and data distribution market.

The substantially superior quality of the digital format as compared to the analog format renders the former substantially more prone to unauthorized copying and pirating, further a digital format is both easier and faster to copy. Copying of a digital data stream, whether compressed, uncompressed, encrypted or non-encrypted, typically does not lead to any appreciable loss of quality in the data. Digital copying thus is essentially unlimited in terms of multi-generation copying. Analog data with its signal to noise ratio loss with every sequential copy, on the other hand, is naturally limited in terms of multi-generation and mass copying.

The advent of the recent popularity in the digital format has also brought about a slew of copy protection and digital rights management (DRM) systems and methods. These systems and methods use technologies such as encryption, watermarking and right descriptions (e.g. rules for accessing and copying data).

One way of protecting content in the form of digital data is to ensure that content will only be transferred between devices if:

the receiving device has been authenticated as being a compliant device, and

the user of the content has the right to transfer (move, copy) that content to another device.

If transfer of content is allowed, this will typically be performed in an encrypted way to make sure that the content cannot be captured illegally in a useful format.

Technology to perform device authentication and encrypted content transfer is available and is called a secure authenticated channel (SAC). Although it might be allowed to make copies of content over a SAC, the content industry is very bullish on content distribution over the Internet. This results in disagreement of the content industry on transferring content over interfaces that match well with the Internet, e.g. Ethernet.

Further, it should be possible for a user visiting his neighbor to watch a movie, which he owns, on the neighbor's big television screen. Typically, the content owner will disallow this, but it might become acceptable if it can be proved that a license holder of that movie (or a device that the license holder owns) is near that television screen.

It is therefore of interest to be able to include an authenticated distance measurement when deciding whether content should be accessed or copied by other devices.

In the article by Stefan Brands and David Chaum, "Distance-Bounding protocols", Eurocrypt '93 (1993), Pages 344-359, integration of distance-bounding protocols with public-key identification schemes is described. Here distance measurement is described based on time measurement using challenge and response bits and with the use of a commitment protocol. This does not allow authenticated device compliancy testing and is not efficient when two devices must also authenticate each other.

It is an object of the invention to obtain a solution to the problem of performing a secure transfer of content within a limited distance.

This is obtained by a method for a first communication device to performing authenticated distance measurement between the first communication device and a second communication device, wherein the first and the second communication device share a common secret and the common secret is used for performing the distance measurement between the first and the second communication device.

Because the common secret is being used for performing the distance measurement, it can be ensured that when measuring the distance from the first communication device to the second communication device, it is the distance between the right devices that is being measured.

The method combines a distance measurement protocol with an authentication protocol. This enables authenticated device compliancy testing and is efficient, because a secure channel is anyhow needed to enable secure communication between devices and a device can first be tested on compliancy before a distance measurement is executed.

In a specific embodiment, the authenticated distance measurement is performed according to the following steps;

transmitting a first signal from the first communication device to the second communication device at a first time $t1$, the second communication device being adapted for receiving the first signal, generating a second signal by modifying the received first signal according to the common secret and transmitting the second signal to the first device.

receiving the second signal at a second time $t2$,

checking if the second signal has been modified according to the common secret, and

determining the distance between the first and the second communication device according to a time difference between t1 and t2.

When measuring a distance by measuring the time difference between transmitting and receiving a signal and using a secret, shared between the first and the second communication device, for determining whether the returned signal really originated from the second communication device, the distance is measured in a secure authenticated way ensuring that the distance will not be measured to a third communication device (not knowing the secret). Using the shared secret for modifying the signal is a simple way to perform a secure authenticated distance measurement.

In a specific embodiment, the first signal is a spread spectrum signal. Thereby a high resolution is obtained and it is possible to cope with bad transmission conditions (e.g. wireless environments with a lot of reflections).

In another embodiment the step of checking if the second signal has been modified according to the common secret is performed by the steps of:

generating a third signal by modifying the first signal according to the common secret, and

comparing the third signal with the received second signal.

This method is an easy and simple way of performing the check, but it requires that both the first communication device and the second communication device know how the first signal is being modified using the common secret.

In a specific embodiment the first signal and the common secret are bit words and the second signal comprises information being generated by performing an exclusive OR operation (XOR) between the bit words. Thereby, it is a very simple operation that has to be performed, resulting in demand for few resources by both the first and the second communication device when performing the operation.

In an embodiment, the common secret has been shared before performing the distance measurement, the sharing being performed by the steps of:

performing an authentication check from the first communication device on the second communication device by checking whether the second communication device is compliant with a set of predefined compliance rules, and

if the second communication device is compliant, sharing the common secret by transmitting the secret to the second communication device.

This is a secure way of performing the sharing of the secret, ensuring that only devices being compliant with compliance rules can receive the secret. Further, the shared secret can afterwards be used for generating a SAC channel between the two devices. The secret could be shared using e.g. key transport mechanisms as described in ISO 11770-3. Alternatively, a key agreement protocol could be used, which e.g. is also described in ISO 11770-3.

In another embodiment the authentication check further comprises checking if the identification of the second device is compliant with an expected identification. Thereby, it is ensured that the second device really is the device that it should be. The identity could be obtained by checking a certificate stored in the second device.

The invention also relates to a method of determining whether data stored on a first communication device are to be accessed by a second communication device, the method comprising the step of performing a distance measurement between the first and the second communication device and checking whether the measured distance is within a pre-

defined distance interval, wherein the distance measurement is an authenticated distance measurement according to the above. By using the authenticated distance measurement in connection with sharing data between devices, unauthorized distribution of content can be reduced.

In a specific embodiment the data stored on the first device is sent to the second device if it is determined that the data stored on the first device are to be accessed by the second device.

The invention also relates to a method of determining whether data stored on a first communication device are to be accessed by a second communication device, the method comprising the step of performing a distance measurement between a third communication device and the second communication device and checking whether the measured distance is within a predefined distance interval, wherein the distance measurement is an authenticated distance measurement according to the above. In this embodiment, the distance is not measured between the first communication device, on which the data are stored, and the second communication device. Instead, the distance is measured between a third communication device and the second communication device, where the third communication device could be personal to the owner of the content.

The invention also relates to a communication device for performing authenticated distance measurement to a second communication device, where the communication device shares a common secret with the second communication device and where the communication device comprises means for measuring the distance to the second device using the common secret.

In an embodiment, the device comprises:

means for transmitting a first signal to a second communication device at a first time t1, the second communication device being adapted for receiving the first signal, generating a second signal by modifying the received first signal according to the common secret and transmitting the second signal,

means for receiving the second signal at a second time t2,

means for checking if the second signal has been modified according to the common secret, and

means for determining the distance between the first and the second communication device according to a time difference between t1 and t2.

The invention also relates to an apparatus for playing back multimedia content comprising a communication device according to the above.

In the following preferred embodiments of the invention will be described referring to the figures, wherein:

FIG. 1 illustrates authenticated distance measurement being used for content protection,

FIG. 2 is a flow diagram illustrating the method of performing authenticated distance measurement,

FIG. 3 illustrates in further detail the step of performing the authenticated distance measurement shown in FIG. 2, and

FIG. 4 illustrates a communication device for performing authenticated distance measurement.

FIG. 1 illustrates an embodiment wherein the authenticated distance measurement is being used for content protection. In the center of the circle 101 a computer 103 is placed. The computer comprises content, such as data, software, images, multimedia content being video and/or audio, stored on e.g. a hard disk, solid state memory, a DVD or a CD. The owner of the computer 103 owns the content and therefore the computer is authorized to access and present the multimedia content for the user. When the user

wants to make a legal copy of the content on another device via e.g. a SAC, the distance between the other device and the computer 103 is measured and only devices within a pre-defined distance illustrated by the devices 105, 107, 109, 111, 113 inside the circle 101 are allowed to receive the content. Whereas the devices 115, 117, 119 having a distance to the computer 103 being larger than the predefined distance are not allowed to receive the content.

In the example a device is a computer 103, but it could e.g. also be a DVD drive, a CD drive or a Video display device, as long as the device comprises a communication device for performing the distance measurement.

In a specific example, the distance might not be measured between the computer 103, on which the data are stored, and the other device, it could be determined between a third device (e.g. a device being personal to the owner of the content and which does not contain the data) and the other device.

In FIG. 2 a flow diagram illustrates the general idea of performing authenticated distance measurement between two devices, 201 and 203 each comprising communication devices for performing the authenticated distance measurement. In the example the first device 201 comprises content which the second device 203 has requested. The authenticated distance measurement then is as follows. In step 205 the first device 201 authenticates the second device 203; this could comprise the steps of checking whether the second device 203 is a compliant device and might also comprise the step of checking whether the second device 203 really is the device identified to the first device 201. Then in step 207, the first device 201 exchanges a secret with the second device 203, which e.g. could be performed by transmitting a random generated bit word to the second device 203. The secret should be shared securely, e.g. according to some key management protocol as described in e.g. ISO 11770.

Then in step 209, a signal for distance measurement is transmitted to the second device 203; the second device modifies the received signal according to the secret and retransmits the modified signal back to the first device. The first device 201 measures the round trip time between the signal leaving and the signal returning and checks if the returned signal was modified according to the exchanged secret. The modification of the returned signal according to some secret will most likely be dependent on the transmission system and the signal used for distance measurement, i.e. it will be specific for each communication system (such as 1394, Ethernet, Bluetooth, IEEE 802.11, etc.).

The signal used for the distance measurement may be a normal data bit signal, but also special signals other than for data communication may be used. In an embodiment spread spectrum signals are used to be able to get high resolution and to be able to cope with bad transmission conditions (e.g. wireless environments with a lot of reflections).

In a specific example a direct sequence spread spectrum signal is used for distance measurement; this signal could be modified by XORing the chips (e.g. spreading code consisting of 127 chips) of the direct sequence code by the bits of the secret (e.g. secret consists also of 127 bits). Also, other mathematical operations similar to XOR could be used.

The authentication 205 and exchange of secret 207 could be performed using the protocols described in some known ISO standards e.g. ISO 9798 and ISO 11770. For example the first device 201 could authenticate the second device 203 according to the following communication scenario:

First device->Second device: $R_B$||Text 1

where $R_B$ is a random number

Second device->First device: CertA||TokenAB

Where CertA is a certificate of A

TokenAB=$R_A$||$R_B$||B||Text3||s$S_A$($R_A$||$R_B$||B||Text2)

$R_A$ is a random number

Indentifier B is an option

s$S_A$ is a signature set by A using private key $S_A$

If TokenAB is replaced with the token as specified in ISO 11770-3 we at the same time can do secret key exchange. We can use this by substituting Text2 by:

Text2=e$P_B$(A||K||Text2)||Text3

Where e$P_B$ is encrypted with Public key B

A is identifier of A

K is a secret to be exchanged

In this case the second device 203 determines the key (i.e. has key control), this is also called a key transport protocol, but also a key agreement protocol could be used. This may be undesirable in which case it can be reversed, such that the first device determines the key. A secret key has now been exchanged according to step 207 in FIG. 2. Again, the secret key could be exchanged by e.g. a key transport protocol or a key agreement protocol.

After the distance has been measured in a secure authenticated way as described above, content data can be sent between the first and the second device in step 211 in FIG. 2.

FIG. 3 illustrates in further detail, the step of performing the authenticated distance measurement. As described above, the first device 301 and the second device 303 have exchanged a secret; the secret is stored in the memory 305 of the first device and the memory 307 of the second device. In order to perform the distance measurement, a signal is transmitted to the second device via a transmitter 305. The second device receives the signal via a receiver 311, and microprocessor 313 modifies the signal by using the locally stored secret. The signal is modified by the second device according to rules known by the first device 301 and transmitted back to the first device via a transmitter 315. The first device 301 receives the modified signal via a receiver 317 and in 319 the received modified signal is compared to a signal, which has been modified locally i.e. by the first device. The local modification is performed in microprocessor 321 by using the signal transmitted to the second device in transmitter 305 and then modifying the signal using the locally stored secret similar to the modification rules used by the second device. If the received modified signal and the locally modified signal are identical, then the received signal is authenticated and can be used for determining the distance between the first and the second device. If the two signals are not identical, then the received signal cannot be authenticated and can therefore not be used for measuring the distance as illustrated by 325. In microprocessor 323 the distance is calculated between the first and the second device; this could e.g. be performed by measuring the time, when the signal is transmitted by the transmitter 309 from the first device to the second device and measuring when the receiver 317 receives the signal from the second device. The time difference between a transmittal time and a reception time can then be used for determining the physical distance between the first device and the second device.

In FIG. 4 a communication device for performing authenticated distance measurement is illustrated. The device 406 comprises a receiver 403 and a transmitter 411. The device further comprises means for performing the steps described above, which could be performed by executing software using a microprocessor 413 connected to memory 415 via a communication bus 417. The communication device could then be placed inside devices such as a DVD, a DVD

recorder, a computer, a CD, a CD recorder, a solid state memory, a television and other devices for providing protected content, accessing protected content, or authorizing the access to protected content.

What is claimed is:

1. A first device for controlling delivery of protected content to a second device, the first device comprising:
   a memory;
   a processor, said processor arranged to:
      receive a certificate of the second device, the certificate providing information regarding the second device;
      determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate;
      provide a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules;
      receive a second signal from the second device after providing the first signal;
      determine whether the second signal is derived from a secret known by the first device;
      determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and
      allow the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.

2. The first device of claim 1, wherein the first signal comprises a random number.

3. The first device of claim 1, wherein the second signal is formed by modifying the first signal based on the secret, wherein the modification comprises performing an XOR operation on the first signal.

4. The first device of claim 1, wherein the processor is further arranged to provide the secret to the second device.

5. The first device of claim 4, wherein the secret is securely provided using one of: a key transport protocol, a key management protocol and a key agreement protocol.

6. The first device of claim 4, wherein the processor arranged to provide the secret to the second device comprises the processor arranged to provide the secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number.

7. The first device of claim 1, wherein the processor is further arranged to receive the secret from the second device.

8. The first device of claim 7, wherein the secret is securely received using one of: a key transport protocol, a key management protocol and a key agreement protocol.

9. The first device of claim 1, wherein the processor arranged to determine whether the second signal is derived from the secret is arranged to:
   modify the first signal according to the secret;
   compare the modified first signal with the second signal; and
   provide an indication when said modified first signal is identical to the second signal.

10. The first device of claim 1, wherein the first signal and the secret are of comparable length.

11. The first device of claim 1, wherein the processor is further arranged to determine an identity of the second device using the certificate.

12. The first device of claim 1, wherein the certificate comprises a public key.

13. The first device of claim 1, wherein the processor is further arranged to provide a certificate to the second device.

14. The first device of claim 1, wherein the predetermined time is based on a communication system associated with the first device.

15. The first device of claim 1, wherein the second signal comprises the first signal modified by the secret.

16. The first device of claim 1, wherein the processor is further arranged to:
   provide instruction to a third device to transmit said protected content, wherein said protected content is stored on said third device.

17. A system for controlling the transmission of protected content from a content provider to a requesting device, the content provider comprising:
   means for receiving a certificate of the requesting device, the certificate providing information for validating the requesting device as being compliant with a set of compliancy rules;
   means for validating that the requesting device is compliant with the set of compliancy rules using said information contained in said certificate;
   means for transmitting a first signal to the requesting device at a first time when said requesting device is validated as being compliant with the set of compliancy rules;
   means for receiving a second signal at a second time from the requesting device;
   means for providing the protected content to the requesting device after determining the second signal depends on a secret known to the content provider, and
   a time difference between the first time and the second time is less than a predetermined time.

18. The system of claim 17, wherein said protected content is stored on a third device.

19. The system of claim 18, wherein said means for providing the requested content comprises:
   means for providing instruction to said third device to provide said content to said requesting device.

20. The system of claim 18, wherein the third device is one of: a DVD, CD and a storage device.

21. The system of claim 17, wherein the secret is securely received by the content provider.

22. The system of claim 17, wherein the secret is securely transmitted by the content provider.

23. The system of claim 17, wherein the certificate identifies the requesting device.

24. The system of claim 17, wherein the predetermined time is based on a type of communication protocol between the requesting device and the content provider.

25. The system of claim 17, wherein the content provider is one of: a DVD, CD and a storage device.

26. The system of claim 17, wherein the second signal comprises the first signal modified by the secret.

27. A first device in communication with a second device, the first device comprising:
   a memory;
   a processor in communication with the memory, the processor arranged to execute software stored on the first device, the software configured to:
      receive from the second device a request for a protected content and a certificate providing information associated with the second device;
      determine whether the second device is suitable for receiving said protected content, wherein determining suitability of said second device is based on said information provided in said certificate;

provide a first signal to said second device when said second device is determined to be suitable for receiving said protected content;

receive from said second device a second signal;

determine whether said second signal is representative of said first signal modified according to a secret known by said first device and said second device;

determine whether a time difference between a time of providing the first signal and receiving the second signal is less than a predetermined time; and

initiate transmission of said protected content to said second device when at least said second signal is representative of said first signal modified according to a secret known by said first device and said second device and said time difference is less than the predetermined time.

**28**. The first device of claim **27**, wherein said protected content is stored on said first device.

**29**. The first device of claim **27**, wherein the software configured to initiate said initiating transmission of said protected content is further configured to provide instruction to a third device to transmit said protected content, wherein said protected content is stored on said third device.

**30**. The first device of claim **29**, wherein said third device is one of a DVD, a CD and a storage device.

**31**. The first device of claim **29**, wherein said third device is remotely located from said first device.

**32**. The first device of claim **27**, wherein suitability is determined as being compliant with a set of compliancy rules.

**33**. The first device of claim **27**, wherein the software is further arranged to:

provide the secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is suitable, said secret comprising a random number.

**34**. A method of a first device controlling delivery of protected content to a second device, the method comprising:

receiving a certificate of the second device, the certificate providing information regarding the second device;

determining whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate;

providing a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules;

receiving a second signal from the second device after providing the first signal;

determining whether the second signal is derived from a secret known by the first device;

determining whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and

allowing the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.

**35**. The method of claim **34**, wherein the first signal comprises a random number.

**36**. The method of claim **34**, wherein the second signal is formed by modifying the first signal based on the secret, wherein the modification comprises performing an XOR operation on the first signal.

**37**. The method of claim **34**, further comprising providing the secret to the second device.

**38**. The method of claim **37**, wherein the secret is securely provided using one of: a key transport protocol, a key management protocol and a key agreement protocol.

**39**. The method of claim **34**, further comprising receiving the secret from the second device.

**40**. The method of claim **39**, wherein the secret is securely received using one of: a key transport protocol, a key management protocol and a key agreement protocol.

**41**. The method of claim **34**, wherein the step of determining whether the second signal is derived from the secret comprises:

modifying the first signal according to the secret;

comparing the modified first signal with the second signal; and

providing an indication when said modified first signal is identical to the second signal.

**42**. The method of claim **34**, wherein the first signal and the secret are of comparable length.

**43**. The method of claim **34**, further comprising determining an identity of the second device using the certificate.

**44**. The method of claim **34**, wherein the certificate comprises a public key.

**45**. The method of claim **34**, further comprising providing a certificate to the second device.

**46**. The method of claim **34**, wherein the predetermined time is based on a communication system associated with the first device.

**47**. The method of claim **34**, wherein the second signal comprises the first signal modified by the secret.

**48**. The method of claim **34**, further comprising providing instruction to a third device to transmit said protected content, wherein said protected content is stored on said third device.

**49**. A first device for controlling delivery of protected content to a second device, the first device comprising:

a memory;

a processor, the processor arranged to:

receive a certificate from the second device prior to sending a first signal;

determine from the certificate if the second device is compliant;

provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number;

provide the first signal to the second device;

receive a second signal from the second device after providing the first signal;

determine if the second signal is derived from the secret by determining whether the second signal is the first signal modified based on the secret;

determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and

allow the protected content to be provided to the second device at least when the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.

**50**. The first device of claim **49**, wherein the processor is further arranged to:

use the secret to generate a secure authenticated channel between the first device and the second device,

use the secure authenticated channel to provide the protected content to the second device.

**51**. The first device of claim **49**, wherein the secret and the first signal are of comparable length.

**52**. The first device of claim **49**, wherein the modification is a XOR operation using the first signal.

**53**. The first device of claim **49**, wherein the processor, arranged to determine that the second signal is derived from the secret, is further arranged to:

modify the first signal according to the secret;

compare the modified first signal with the second signal; and

determine that the modified first signal is identical to the second signal.

**54**. The first device of claim **49**, wherein the first signal comprises a random number.

**55**. A method of a first device controlling delivery of protected content to a second device, the method comprising:

receiving a certificate from the second device prior to sending a first signal;

determining from the certificate if the second device is compliant;

providing a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number;

providing the first signal to the second device;

receiving a second signal from the second device after providing the first signal;

determining if the second signal is derived from the secret by determining whether the second signal is the first signal modified based on the secret;

determining whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and

allowing the protected content to be provided to the second device at least when the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.

**56**. The method of claim **55**, further comprising:

using the secret to generate a secure authenticated channel between the first device and the second device,

using the secure authenticated channel to provide the protected content to the second device.

**57**. The method of claim **55**, wherein the secret and the first signal have the same bit length.

**58**. The method of claim **55**, wherein the modification is a XOR operation using the first signal.

**59**. The method of claim **55**, wherein the step of determining that the second signal is derived from the secret comprises:

modifying the first signal according to the secret;

comparing the modified first signal with the second signal; and

determining that the modified first signal is identical to the second signal.

**60**. The method of claim **55**, wherein the first signal comprises a random number.

* * * * *



(12) **United States Patent**　　(10) **Patent No.:**　US 10,091,186 B2
Kamperman　　　　　　　　　　 (45) **Date of Patent:**　*Oct. 2, 2018

(54) **SECURE AUTHENTICATED DISTANCE MEASUREMENT**

(71) Applicant: **KONINKLIJKE PHILIPS N.V.,** Eindhoven (NL)

(72) Inventor: **Franciscus L. A. J. Kamperman,** Geldrop (NL)

(73) Assignee: **Koninklijke Philips N.V.,** Eindhoven (NL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 72 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/352,646**

(22) Filed: **Nov. 16, 2016**

(65) **Prior Publication Data**

US 2017/0063556 A1　　Mar. 2, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 15/229,207, filed on Aug. 5, 2016, now Pat. No. 9,590,977, which is a
(Continued)

(30) **Foreign Application Priority Data**

Jul. 26, 2002　(EP) .................................... 02078076

(51) **Int. Cl.**
*H04L 29/06*　　(2006.01)
*H04L 9/14*　　(2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... *H04L 63/0823* (2013.01); *G06F 21/10* (2013.01); *H04L 9/14* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ......... H04L 63/0823; H04L 9/14; H04L 9/30; H04L 9/3263; H04L 63/062; H04L 43/16;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,438,824 A　　3/1984　Mueller-Schoioer
4,688,036 A　　8/1987　Hirano et al.
(Continued)

FOREIGN PATENT DOCUMENTS

EP　　1100035 A1　　5/2001
JP　　H04306760 A　　10/1992
(Continued)

OTHER PUBLICATIONS

Ikeno et al "Modern Cryptography Theory" Japan, Institute of Electronics, Information and Communication Engineers, Nov. 15, 1997, p. 175-177.
(Continued)

*Primary Examiner* — Darren B Schwartz

(57)　　**ABSTRACT**

The invention relates to a method for a first communication device to perform authenticated distance measurement between the first communication device and a second communication device, wherein the first and the second communication device share a common secret and the common secret is used for performing the distance measurement between the first and the second communication device. The invention also relates to a method of determining whether data stored on a first communication device are to be accessed by a second communication device. Moreover, the invention relates to a communication device for performing authenticated distance measurement to a second communication device. The invention also relates to an apparatus for playing back multimedia content comprising a communication device.

**36 Claims, 3 Drawing Sheets**



### Related U.S. Application Data

continuation of application No. 14/538,493, filed on Nov. 11, 2014, now Pat. No. 9,436,809, which is a continuation of application No. 10/521,858, filed as application No. PCT/IB03/02932 on Jun. 27, 2003, now Pat. No. 8,886,939.

(51) **Int. Cl.**

| | |
|---|---|
| *H04L 9/30* | (2006.01) |
| *H04L 9/32* | (2006.01) |
| *H04L 12/26* | (2006.01) |
| *G06F 21/10* | (2013.01) |
| *H04W 24/00* | (2009.01) |
| *H04W 12/06* | (2009.01) |

(52) **U.S. Cl.**
CPC ............. *H04L 9/30* (2013.01); *H04L 9/3263* (2013.01); *H04L 63/0852* (2013.01); *H04L 43/16* (2013.01); *H04L 63/062* (2013.01); *H04L 63/107* (2013.01); *G06F 2221/07* (2013.01); *G06F 2221/2111* (2013.01); *H04L 63/0428* (2013.01); *H04L 2463/101* (2013.01); *H04W 12/06* (2013.01); *H04W 24/00* (2013.01)

(58) **Field of Classification Search**
CPC ............. H04L 43/0852; H04L 63/107; H04L 63/0428; H04L 2463/101; G06F 21/10; G06F 2221/07; G06F 2221/2111; H04W 24/00; H04W 12/06
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,926,480 A | 5/1990 | Chaum | |
| 5,126,746 A | 6/1992 | Gritton | |
| 5,351,293 A * | 9/1994 | Michener | H04L 9/0822 380/44 |
| 5,596,641 A | 1/1997 | Ohashi et al. | |
| 5,602,917 A | 2/1997 | Mueller | |
| 5,659,617 A | 8/1997 | Fischer | |
| 5,708,712 A * | 1/1998 | Brinkmeyer | B60R 25/04 340/5.25 |
| 5,723,911 A | 3/1998 | Glehr | |
| 5,778,071 A | 7/1998 | Caputo et al. | |
| 5,937,065 A | 8/1999 | Simon et al. | |
| 5,949,877 A * | 9/1999 | Traw | G06F 21/10 380/30 |
| 5,983,347 A | 11/1999 | Brinkmeyer et al. | |
| 6,085,320 A | 7/2000 | Kaliski | |
| 6,088,450 A | 7/2000 | Davis et al. | |
| 6,148,404 A * | 11/2000 | Yatsukawa | G06F 21/335 380/30 |
| 6,151,676 A | 11/2000 | Cuccia et al. | |
| 6,208,239 B1 | 3/2001 | Muller et al. | |
| 6,346,878 B1 | 2/2002 | Pohlman et al. | |
| 6,351,235 B1 | 2/2002 | Stilp | |
| 6,442,690 B1 | 8/2002 | Howard, Jr. | |
| 6,484,948 B1 | 11/2002 | Sonoda | |
| 6,493,825 B1 | 12/2002 | Blumenau et al. | |
| 6,526,598 B1 | 3/2003 | Horn | |
| 6,550,011 B1 | 4/2003 | Sims | |
| 7,200,233 B1 | 4/2007 | Keller et al. | |
| 7,242,766 B1 | 7/2007 | Lyle | |
| 7,516,325 B2 | 4/2009 | Willey | |
| 7,685,423 B1 * | 3/2010 | Walmsley | G06F 21/44 399/24 |
| 7,787,865 B2 | 8/2010 | Willey | |
| 7,898,977 B2 | 3/2011 | Roese | |
| 8,068,610 B2 | 11/2011 | Moroney | |
| 8,107,627 B2 | 1/2012 | Epstein | |
| 8,352,582 B2 | 1/2013 | Epstein | |
| 8,997,243 B2 | 3/2015 | Epstein | |
| 2001/0002486 A1 * | 5/2001 | Kocher | G06F 7/723 713/171 |
| 2001/0008558 A1 | 7/2001 | Hirafuji | |
| 2001/0043702 A1 | 11/2001 | Elteto et al. | |
| 2001/0044786 A1 | 11/2001 | Ishihashi | |
| 2001/0050990 A1 * | 12/2001 | Sudia | G06Q 20/02 380/286 |
| 2002/0007452 A1 * | 1/2002 | Traw | G06F 21/10 713/152 |
| 2002/0026424 A1 | 2/2002 | Akashi | |
| 2002/0026576 A1 | 2/2002 | Das-Purkayastha et al. | |
| 2002/0035690 A1 | 3/2002 | Nakano | |
| 2002/0061748 A1 | 5/2002 | Nakakita et al. | |
| 2002/0078227 A1 | 6/2002 | Kronenberg | |
| 2002/0166047 A1 | 11/2002 | Kawamoto | |
| 2003/0021418 A1 | 1/2003 | Arakawa et al. | |
| 2003/0030542 A1 | 2/2003 | Von Hoffmann | |
| 2003/0051151 A1 | 3/2003 | Asano | |
| 2003/0065918 A1 | 4/2003 | Willey | |
| 2003/0070092 A1 | 4/2003 | Hawkes et al. | |
| 2003/0112978 A1 | 6/2003 | Rodman et al. | |
| 2003/0184431 A1 | 10/2003 | Lundkvist | |
| 2003/0220765 A1 | 11/2003 | Overy et al. | |
| 2004/0015693 A1 | 1/2004 | Kitazumi | |
| 2004/0080426 A1 | 4/2004 | Fraenkel | |
| 2005/0114647 A1 | 5/2005 | Epstein | |
| 2005/0265503 A1 | 12/2005 | Rofheart et al. | |
| 2006/0294362 A1 | 12/2006 | Epstein | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | H0619948 A | 1/1994 |
| JP | H08234658 A | 9/1996 |
| JP | 9170364 A | 6/1997 |
| JP | H09170364 A | 6/1997 |
| JP | 11101035 A | 4/1999 |
| JP | 11208419 A | 8/1999 |
| JP | 2000357156 A | 12/2000 |
| JP | 2001249899 A | 9/2001 |
| JP | 2001257672 A | 9/2001 |
| JP | 2002124960 | 4/2002 |
| JP | 2002189966 A | 7/2002 |
| WO | 9739553 A1 | 10/1997 |
| WO | 9949378 | 9/1999 |
| WO | 0152234 A1 | 7/2001 |
| WO | 0193434 A1 | 12/2001 |
| WO | 0233887 A2 | 4/2002 |
| WO | 0235036 A1 | 5/2002 |
| WO | 02054353 A1 | 7/2002 |

OTHER PUBLICATIONS

Modern Cryptography Theory (1986) Chapter 9, ISBN: 4-88552-064-9 (Japanese).
Hayashi et al Encryption and Authentication Program Module , Technical Paper (Japanese) NTT R&D vol. 44, No. 10 Oct. 1, 1995.
Stefan Brands and Devid Chaum "Distance Bounding Protocols" Eurocrypt '93, (1993) p. 344-359.
Tim Kindber & Kan Zhang "Context Authentin Using Constrained Channels" pp. 1-8 , Apr. 16, 2001.
Hitachi Ltd., 5C Digital Transmission Content Protection White Paper Rev. 1.0 Jul. 14, 1998. p. 1013.
Boyd et al "Protocols for Authentin and Key Establishment" Spring-Verlag, Sep. 17, 2003, p. 116-120, 195, 305.
SmartRight™ Certification for FCC Approval for Use with the Broadcast Flag, Mar. 1, 2004.
SmartRight™ Copy Protection for System for Digital Home Networks, Deployment Process, CPTWG, Nov. 28, 2001.
SmartRight™ Copy Protection System for Digital Home Networks, CPTWG, May 24, 2001.
SmartRight™ Digital Broadcast Content Protection, Presentation to FCC, Apr. 2, 2004 (cited in litigation).
SmartRight™ Technical White Paper, Version 1.7, Jan. 2003 ("White Paper") (cited in litigation).

(56)                    **References Cited**

OTHER PUBLICATIONS

Internet Security Association and Key Management Protocol (ISAKMP), Request for Comments 2408 ("RFC 2408")—cited in litigation.
International Standard ISO/IEC 11770-3 (1st ed.) ("ISO 11770-3") , 2008.
Scott Crosby, et al., "A Cryptanalysis of the High-bandwidth Digital Content Protection System" Computer and Communications Security, (2001).
SmartRight™ Specifications Sep. 26, 2001.
SmartRight™ Copy Protection System for Digital Home Networks, CPTWG, Jul. 11, 2001.
Bruce Schneier, Applied Cryptography (2d ed. 1996) ("Schneier").
Steven M. Bellovin and Michael Merritt, "Encrypted Key Exchange: Password-Based Protocols Secure Against Dictionary Attacks".
RFC 2463 Internet Control Message Protocol Dec. 1998.
RFC2246 The TLS Protocol, Jan. 1999.
Internet Security Association and Key Management Protocol (ISAKMP), Request for Comments 2408 ("RFC 2408") , 1998.
High Bandwidth Digital Content Protection System Feb. 17, 2000.
High Bandwidth Digital Content Protection System Revision 1.0 Erratum Mar. 1, 2001.
Digital Transmission Content Protection Specification vol. 1 Hitachi Ltd. Revision 1.0 Apr. 12, 1999.
Digital Transmission Content Protection Specification vol. 1 (Informational Version) Hitachi Ltd. Revision 1.2A Feb. 25, 2002.
Declaration of William Rosenblatt, Microsoft Exhibit 1009, 2018.
Supplemental Declaration of William Rosenblatt, Microsoft Exhibit 1015, 2018.
Petition for Inter Parties Review of U.S. Pat. No. 8,543,819, 2018.
Patent Owner's Preliminary Response, 2018.
Petitioners' Reply to Patent Owner's Preliminary Response, 2018.
Patent Owner's Sur-Reply to Petitioners' Reply, 2018.
Petition for Inter Parties Review of U.S. Pat. No. 9,436,809, 2018.
Markman Order Filed Jul. 11, 2017.
Internet Security Association and Key Management Protocol (ISAKMP), Request for Comments 2407 ("RFC 2407"), Nov. 1998.
Internet Security Association and Key Management Protocol (ISAKMP), Request for Comments 2409 ("RFC 2409"), Nov. 1998.

* cited by examiner



**FIG. 1**



**FIG. 2**



FIG. 3



FIG. 4

1

## SECURE AUTHENTICATED DISTANCE MEASUREMENT

This application is a continuation of the patent applications entitled "Secure Authenticated Distance Measurement", filed on Aug. 5, 2016 and afforded Ser. No. 15/229,207 which is a continuation of the application filed Nov. 11, 2014 and afforded Ser. No. 14/538,493 which claims priority pursuant to 35 USC 120, priority to and the benefit of the earlier filing date of, that patent application entitled "Secure Authenticated Distance Measurement", filed on Jan. 21, 2005 and afforded Ser. No. 10/521,858 (now U.S. Pat. No. 8,886,939), which claimed priority to and the benefit of the earlier filing date, as a National Stage Filing of that international patent application filed on Jun. 27, 2003 and afforded serial number PCT/IB2003/02932 (WO2004014037), which claimed priority to and the benefit of the earlier filing date of that patent application filed on Jul. 26, 2002 and afforded serial number EP 02078076.3, the contents of all of which are incorporated by reference, herein.

This application is further related to that patent application entitled "Secure authenticated Distance Measurement", filed on Jul. 24, 2009 and afforded Ser. No. 12/508,917 (now U.S. Pat. No. 8,543,819), issued Sep. 24, 2013), which claimed priority to and the benefit of the earlier filing date of that patent application entitled "Secure Authenticated Distance Measurement", filed on Jan. 21, 2005 and afforded Ser. No. 10/521,858 (now U.S. Pat. No. 8,886,939), the contents of which are incorporated by reference herein.

The invention relates to a method for a first communication device to performing authenticated distance measurement between a first communication device and a second communication device. The invention also relates to a method of determining whether data stored on a first communication device is to be accessed by a second communication device. Moreover, the invention relates to a communication device for performing authenticated distance measurement to a second communication device. The invention also relates to an apparatus for playing back multimedia content comprising a communication device.

Digital media have become popular carriers for various types of data information. Computer software and audio information, for instance, are widely available on optical compact disks (CDs) and recently also DVD has gained in distribution share. The CD and the DVD utilize a common standard for the digital recording of data, software, images, and audio. Additional media, such as recordable discs, solid-state memory, and the like, are making considerable gains in the software and data distribution market.

The substantially superior quality of the digital format as compared to the analog format renders the former substantially more prone to unauthorized copying and pirating, further a digital format is both easier and faster to copy. Copying of a digital data stream, whether compressed, uncompressed, encrypted or non-encrypted, typically does not lead to any appreciable loss of quality in the data. Digital copying thus is essentially unlimited in terms of multi-generation copying. Analog data with its signal to noise ratio loss with every sequential copy, on the other hand, is naturally limited in terms of multi-generation and mass copying.

The advent of the recent popularity in the digital format has also brought about a slew of copy protection and DRM systems and methods. These systems and methods use technologies such as encryption, watermarking and right descriptions (e.g. rules for accessing and copying data).

2

One way of protecting content in the form of digital data is to ensure that content will only be transferred between devices if

the receiving device has been authenticated as being a compliant device, and

the user of the content has the right to transfer (move, copy) that content to another device.

If transfer of content is allowed, this will typically be performed in an encrypted way to make sure that the content cannot be captured illegally in a useful format.

Technology to perform device authentication and encrypted content transfer is available and is called a secure authenticated channel (SAC). Although it might be allowed to make copies of content over a SAC, the content industry is very bullish on content distribution over the Internet. This results in disagreement of the content industry on transferring content over interfaces that match well with the Internet, e.g. Ethernet.

Further, it should be possible for a user visiting his neighbor to watch a movie, which he owns, on the neighbor's big television screen. Typically, the content owner will disallow this, but it might become acceptable if it can be proved that a license holder of that movie (or a device that the license holder owns) is near that television screen.

It is therefore of interest to be able to include an authenticated distance measurement when deciding whether content should be accessed or copied by other devices.

In the article by Stefan Brands and David Chaum, "Distance-Bounding protocols", Eurocrypt '93 (1993), Pages 344-359, integration of distance-bounding protocols with public-key identification schemes is described. Here distance measurement is described based on time measurement using challenge and response bits and with the use of a commitment protocol. This does not allow authenticated device compliancy testing and is not efficient when two devices must also authenticate each other.

It is an object of the invention to obtain a solution to the problem of performing a secure transfer of content within a limited distance.

This is obtained by a method for a first communication device to performing authenticated distance measurement between the first communication device and a second communication device, wherein the first and the second communication device share a common secret and the common secret is used for performing the distance measurement between the first and the second communication device.

Because the common secret is being used for performing the distance measurement, it can be ensured that when measuring the distance from the first communication device to the second communication device, it is the distance between the right devices that is being measured.

The method combines a distance measurement protocol with an authentication protocol. This enables authenticated device compliancy testing and is efficient, because a secure channel is anyhow needed to enable secure communication between devices and a device can first be tested on compliancy before a distance measurement is executed.

In a specific embodiment, the authenticated distance measurement is performed according to the following steps,

transmitting a first signal from the first communication device to the second communication device at a first time t1, the second communication device being adapted for receiving the first signal, generating a second signal by modifying

the received first signal according to the common secret and transmitting the second signal to the first device,

receiving the second signal at a second time t2,

checking if the second signal has been modified according to the common secret,

determining the distance between the first and the second communication device according to a time difference between t1 and t2.

When measuring a distance by measuring the time difference between transmitting and receiving a signal and using a secret, shared between the first and the second communication device, for determining whether the returned signal really originated from the second communication device, the distance is measured in a secure authenticated way ensuring that the distance will not be measured to a third communication device (not knowing the secret). Using the shared secret for modifying the signal is a simple way to perform a secure authenticated distance measurement.

In a specific embodiment the first signal is a spread spectrum signal. Thereby a high resolution is obtained and it is possible to cope with bad transmission conditions (e.g. wireless environments with a lot of reflections).

In another embodiment the step of checking if the second signal has been modified according to the common secret is performed by the steps of,

generating a third signal by modifying the first signal according to the common secret,

comparing the third signal with the received second signal.

This method is an easy and simple way of performing the check, but it requires that both the first communication device and the second communication device know how the first signal is being modified using the common secret.

In a specific embodiment the first signal and the common secret are bit words and the second signal comprises information being generated by performing an XOR between the bit words. Thereby, it is a very simple operation that has to be performed, resulting in demand for few resources by both the first and the second communication device when performing the operation.

In an embodiment the common secret has been shared before performing the distance measurement, the sharing being performed by the steps of,

performing an authentication check from the first communication device on the second communication device by checking whether the second communication device is compliant with a set of predefined compliance rules,

if the second communication device is compliant, sharing the common secret by transmitting the secret to the second communication device.

This is a secure way of performing the sharing of the secret, ensuring that only devices being compliant with compliance rules can receive the secret. Further, the shared secret can afterwards be used for generating a SAC channel between the two devices. The secret could be shared using e.g. key transport mechanisms as described in ISO 11770-3. Alternatively, a key agreement protocol could be used, which e.g. is also described in ISO 11770-3.

In another embodiment the authentication check further comprises checking if the identification of the second device is compliant with an expected identification. Thereby, it is ensured that the second device really is the device that it should be. The identity could be obtained by checking a certificate stored in the second device.

The invention also relates to a method of determining whether data stored on a first communication device are to

be accessed by a second communication device, the method comprising the step of performing a distance measurement between the first and the second communication device and checking whether the measured distance is within a predefined distance interval, wherein the distance measurement is an authenticated distance measurement according to the above. By using the authenticated distance measurement in connection with sharing data between devices, unauthorized distribution of content can be reduced.

In a specific embodiment the data stored on the first device is sent to the second device if it is determined that the data stored on the first device are to be accessed by the second device.

The invention also relates to a method of determining whether data stored on a first communication device are to be accessed by a second communication device, the method comprising the step of performing a distance measurement between a third communication device and the second communication device and checking whether the measured distance is within a predefined distance interval, wherein the distance measurement is an authenticated distance measurement according to the above. In this embodiment, the distance is not measured between the first communication device, on which the data are stored, and the second communication device. Instead, the distance is measured between a third communication device and the second communication device, where the third communication device could be personal to the owner of the content.

The invention also relates to a communication device for performing authenticated distance measurement to a second communication device, where the communication device shares a common secret with the second communication device and where the communication device comprises means for measuring the distance to the second device using the common secret.

In an embodiment the device comprises:

means for transmitting a first signal to a second communication device at a first time t1, the second communication device being adapted for receiving the first signal, generating a second signal by modifying the received first signal according to the common secret and transmitting the second signal,

means for receiving the second signal at a second time t2,

means for checking if the second signal has been modified according to the common secret, and

means for determining the distance between the first and the second communication device according to a time difference between t1 and t2.

The invention also relates to an apparatus for playing back multimedia content comprising a communication device according to the above.

In the following preferred embodiments of the invention will be described referring to the figures, wherein:

FIG. 1 illustrates authenticated distance measurement being used for content protection,

FIG. 2 is a flow diagram illustrating the method of performing authenticated distance measurement,

FIG. 3 illustrates in further detail the step of performing the authenticated distance measurement shown in FIG. 2,

FIG. 4 illustrates a communication device for performing authenticated distance measurement.

FIG. 1 illustrates an embodiment where authenticated distance measurement is being used for content protection. In the center of the circle 101 a computer 103 is placed.

The computer comprises content, such as multimedia content being video or audio, stored on e.g. a hard disk, DVD or a CD. The owner of the computer owns the content

and therefore the computer is authorized to access and present the multimedia content for the user. When the user wants to make a legal copy of the content to another device via e.g. a SAC, the distance between the other device and the computer 103 is measured and only devices within a pre-defined distance illustrated by the devices 105, 107, 109, 111, 113 inside the circle 101 are allowed to receive the content. Whereas the devices 115, 117, 119 having a distance to the computer 101 being larger than the predefined distance are not allowed to receive the content.

In the example a device is a computer, but it could e.g. also be a DVD player, a CD drive or a Video, as long as the device comprises a communication device for performing the distance measurement.

In a specific example the distance might not have to be measured between the computer, on which the data are stored, and the other device, it could also be a third device e.g. a device being personal to the owner of the content which is within the predefined distance.

In FIG. 2 a flow diagram illustrates the general idea of performing authenticated distance measurement between two devices, 201 and 203 each comprising communication devices for performing the authenticated distance measurement. In the example the first device 201 comprises content which the second device 203 has requested. The authenticated distance measurement then is as follows. In step 205 the first device 201 authenticates the second device 203; this could comprise the steps of checking whether the second device 203 is a compliant device and might also comprise the step of checking whether the second device 203 really is the device identified in the first device 201. Then in step 207, the first device 201 exchanges a secret with the second device 203, which e.g. could be performed by transmitting a random generated bit word to second device 203. The secret should be shared securely, e.g. according to some key management protocol as described in e.g. ISO 11770.

Then in step 209, a signal for distance measurement is transmitted to the second device 203; the second device modifies the received signal according to the secret and retransmits the modified signal back to the first device. The first device 201 measures the round trip time between the signal leaving and the signal returning and checks if the returned signal was modified according to the exchanged secret. The modification of the returned signal according to some secret will most likely be dependent on the transmission system and the signal used for distance measurement, i.e. it will be specific for each communication system (such as 1394, Ethernet, Bluetooth, IEEE 802.11, etc.).

The signal used for the distance measurement may be a normal data bit signal, but also special signals other than for data communication may be used. In an embodiment spread spectrum signals are used to be able to get high resolution and to be able to cope with bad transmission conditions (e.g. wireless environments with a lot of reflections).

In a specific example a direct sequence spread spectrum signal is used for distance measurement; this signal could be modified by XORing the chips (e.g. spreading code consisting of 127 chips) of the direct sequence code by the bits of the secret (e.g. secret consists also of 127 bits). Also, other mathematical operations as XOR could be used.

The authentication 205 and exchange of secret 207 could be performed using the protocols described in some known ISO standards ISO 9798 and ISO 11770. For example the first device 201 could authenticate the second device 203 according to the following communication scenario:

First device−>Second device: $R_B \| Text\ 1$
where $R_B$ is a random number
Second device−>First device: CertA $\|$ TokenAB
Where CertA is a certificate of A
TokenAB=$R_A \| R_B \| B \| Text3 \| sS_A(R_A \| R_B \| B \| Text2)$
$R_A$ is a random number
Identifier B is an option
$sS_A$ is a signature set by A using private key $S_A$

If TokenAB is replaced with the token as specified in ISO 11770-3 we at the same time can do secret key exchange. We can use this by substituting Text2 by:
Text2:=e$P_B(A \| K \| Text2) \| Text3$
Where e$P_B$ is encrypted with Public key B
A is identifier of A
K is a secret to be exchanged

In this case the second device 203 determines the key (i.e. has key control), this is also called a key transport protocol, but also a key agreement protocol could be used. This may be undesirable in which case it can be reversed, such that the first device determines the key. A secret key has now been exchanged according to step 207 in FIG. 2. Again, the secret key could be exchanged by e.g. a key transport protocol or a key agreement protocol.

After the distance has been measured in a secure authenticated way as described above content, data can be sent between the first and the second device in step 211 in FIG. 2.

FIG. 3 illustrates in further detail the step of performing the authenticated distance measurement. As described above the first device 301 and the second device 303 have exchanged a secret; the secret is stored in the memory 305 of the first device and the memory 307 of the second device. In order to perform the distance measurement, a signal is transmitted to the second device via a transmitter 309. The second device receives the signal via a receiver 311 and 313 modifies the signal by using the locally stored secret. The signal is modified according to rules known by the first device 301 and transmitted back to the first device via a transmitter 315. The first device 301 receives the modified signal via a receiver 317 and in 319 the received modified signal is compared to a signal, which has been modified locally. The local modification is performed in 321 by using the signal transmitted to the second device in transmitter 309 and then modifying the signal using the locally stored secret similar to the modification rules used by the second device. If the received modified signal and the locally modified signal are identical, then the received signal is authenticated and can be used for determining the distance between the first and the second device. If the two signals are not identical, then the received signal cannot be authenticated and can therefore not be used for measuring the distance as illustrated by 325. In 323 the distance is calculated between the first and the second device; this could e.g. be performed by measuring the time, when the signal is transmitted by the transmitter 309 from the first device to the second device and measuring when the receiver 317 receives the signal from the second device. The time difference between transmittal time and receive time can then be used for determining the physical distance between the first device and the second device.

In FIG. 4 a communication device for performing authenticated distance measurement is illustrated. The device 401 comprises a receiver 403 and a transmitter 411. The device further comprises means for performing the steps described above, which could be by executing software using a micro-processor 413 connected to memory 415 via a communication bus 417. The communication device could then be

placed inside devices such as a DVD, a computer, a CD, a CD recorder, a television and other devices for accessing protected content.

What is claimed is:

**1**. A first device for controlling delivery of protected content to a second device, the first device comprising a processor circuit, the processor circuit arranged to execute instructions, the instructions arranged to:

    receive a second device certificate from the second device prior to sending a first signal;

    provide the first signal to the second device when the second device certificate indicates that the second device is compliant with at least one compliance rule;

    receive a second signal from the second device after providing the first signal; and

    provide the protected content to the second device when the second signal is derived from a secret and a time between the providing of the first signal and the receiving of the second signal is less than a predetermined time,

wherein the secret is known by the first device.

**2**. The first device of claim **1**, wherein the secret is securely provided to the second device by the first device.

**3**. The first device of claim **2**, wherein determining that the second signal is derived from the secret comprises:

    modifying the first signal, wherein the modifying requires the secret; and

    determining that the modified first signal is identical to the second signal.

**4**. The first device of claim **3** wherein the secret comprises a first random number.

**5**. The first device of claim **4** wherein the secret is encrypted with a public key.

**6**. The first device of claim **5** wherein the first signal comprises a second random number.

**7**. The first device of claim **2**, wherein the second signal comprises the first signal modified by the secret.

**8**. The first device of claim **2**, wherein determining that the second signal is derived from the secret comprises:

    modifying the second signal, wherein the modifying requires the secret; and

    determining that the modified second signal is identical to the first signal.

**9**. The first device of claim **1**, wherein determining that the second signal is derived from the secret comprises:

    modifying the first signal, wherein the modifying requires the secret; and

    determining that the modified first signal is identical to the second signal.

**10**. The first device of claim **1**, wherein the predetermined time is based on a communication system associated with the first device.

**11**. The first device of claim **1**, further comprising instructions arranged to provide the secret to the second device.

**12**. The first device of claim **1**, wherein the second signal comprises the first signal modified by the secret.

**13**. The first device of claim **1** wherein the secret comprises a random number.

**14**. The first device of claim **1** wherein the secret is encrypted with a public key.

**15**. The first device of claim **1** wherein the first signal comprises a random number.

**16**. The first device of claim **1**, wherein the second signal comprises an XOR operation of the first signal with the secret.

**17**. The first device of claim **1**, further comprising instructions arranged to receive the secret from the second device.

**18**. The first device of claim **1**, wherein determining that the second signal is derived from the secret comprises:

    modifying the second signal, wherein the modifying requires the secret; and

    determining that the modified second signal is identical to the first signal.

**19**. A method of controlling delivery of protected content from a first device to a second device, the first device comprising a processor circuit the processor circuit arranged to execute instructions implementing the method, the method comprising:

    receiving a second device certificate from the second device prior to sending a first signal;

    providing the first signal to the second device when the second device certificate indicates that the second device is compliant with at least one compliance rule;

    receiving a second signal from the second device after providing the first signal;

    sending the protected content from the first device to the second device when the second signal is derived from the secret and a time between the providing of the first signal and the receiving of the second signal is less than a predetermined time,

wherein the secret is known by the first device.

**20**. The method of claim **19**, wherein the secret is securely provided to the second device by the first device.

**21**. The method of claim **20**, wherein determining that the second signal is derived from the secret comprises:

    modifying the first signal according to the secret; and

    determining that the modified first signal is identical to the second signal.

**22**. The method of claim **21**, wherein the secret comprises a first random number.

**23**. The method of claim **22**, wherein the secret is encrypted with a public key.

**24**. The method of claim **23**, wherein the first signal comprises a second random number.

**25**. The method of claim **20**, wherein the second signal comprises the first signal modified by the secret.

**26**. The method of claim **20**, wherein determining that the second signal is derived from the secret comprises:

    modifying the second signal according to the secret; and

    determining that the modified second signal is identical to the first signal.

**27**. The method of claim **19**, wherein determining that the second signal is derived from the secret comprises:

    modifying the first signal according to the secret; and

    determining that the modified first signal is identical to the second signal.

**28**. The method of claim **19**, wherein the predetermined time is based on a communication system associated with the first device.

**29**. The method of claim **19**, further comprising providing the secret to the second device.

**30**. The method of claim **19**, wherein the second signal comprises the first signal modified by the secret.

**31**. The method of claim **19**, wherein the secret comprises a random number.

**32**. The method of claim **19**, wherein the secret is encrypted with a public key.

**33**. The method of claim **19**, wherein the first signal comprises a random number.

**34**. The method of claim **19**, wherein the second signal comprises an XOR operation of the first signal with the secret.

**35**. The method of claim **19**, further comprising instructions arranged to receive the secret from the second device.

**36**. The method of claim **19**, wherein determining that the second signal is derived from the secret comprises:

modifying the second signal according to the secret; and

determining that the modified second signal is identical to the first signal.

* * * * *

CERTIFICATE OF SERVICE

**Case Numbers:** 2026-1237

**Short Case Caption:** *Media Content Protection LLC v. Intel Corporation*

I certify that I served a copy of the foregoing filing on February 9, 2026 by email on the below individuals at the following locations.

| Person Served | Service Location |
|---|---|
| Christina J. McCullough<br>PERKINS COIE LLP | 1301 Second Avenue, Suite 4200<br>Seattle, Washington 98101<br>CMcCullough@perkinscoie.com |
| Chad S. Campbell<br>PERKINS COIE LLP | 2525 E. Camelback Road, Suite 500<br>Phoenix, Arizona 85016<br>CSCampbell@perkinscoie.com |
| Tara L. Kurtis<br>PERKINS COIE LLP | 110 N. Wacker Drive, Suite 3400<br>Chicago, Illinois 60606<br>TKurtis@perkinscoie.com |

Date: February 9, 2026

*/s/ Peter F. Snell*
Peter F. Snell

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS**

**Case Numbers:** 2026-1237

**Short Case Caption:** *Media Content Protection LLC v. Intel Corporation*

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and the Federal Circuit rules because the filing has been prepared using a proportionally-spaced typeface and includes 13,975 words.

Date: February 9, 2026

*/s/ Peter F. Snell*
Peter F. Snell